896 F.2d 1557
 Blue Sky L. Rep. P 73,224, Fed. Sec. L. Rep. P 94,955
CASCADE ENERGY AND METALS CORPORATION, a Nevada corporation,
Plaintiff-Appellee, Cross-Appellant,
v.
Jeffrey G. BANKS, Kenneth Caldwell, Coastal Computer
Investments, a California partnership, Elmer J. Davis,
Harmatz and Hodowski, a California partnership, David G.
Henry, Roger A. Mann, H.E. Moses, Robert A. Nickerson, Peter
P. Samarin, Herbert W. Stoltenberg, Edwin Stoltenberg, Chris
Waugh, Samuel Harmatz, Bernard Hodowski, Patricia
Stoltenberg, Mann Caldwell Partnership, a partnership,
Delford R. Ashley, George Slater, Patricia Slater, Robert
Doub, Sam Hambarian, Alyce Hambarian, Lionel Ascher, A.C.
Nejedly, R.E. Donahey, Grace V. Duncan and Elliot Weinberg,
Defendants-Appellants, Cross-Appellees.
Jeffery G. BANKS, Kenneth Caldwell, Coastal Computer
Investments, a California partnership, Elmer J. Davis,
Harmatz and Hodowski, a California partnership, David G.
Henry, Roger A. Mann, Mann Caldwell Partnership, H.E. Moses,
Robert A. Nickerson, Peter P. Samarin, Patricia Stoltenberg,
Herbert W. Stoltenberg, Edwin Stoltenberg, Chris Waugh,
Delford R. Ashley, George Slater, Patricia Slater, Robert
Doub, Sam Hambarian, Alyce Hambarian, Lionel Ascher, A.C.
Nejedly, R.E. Donahey, Grace V. Duncan, Elliot Weinberg,
Bernard Hodowski and Samuel Harmatz, Counterclaimants,
Crossclaimants, Cross-Counterdefendants, Appellants, Cross-Appellees,
v.
CASCADE ENERGY AND METALS CORPORATION, Counterdefendant,
Cross-Counterclaimant, Crossclaim Defendant, Appellee,
and
W. David Weston, Telegraph Mine Limited, a partnership, Rex
Montis Silver Co., Telegraph Mine Joint Venture, Gold
Technics, Ltd., a limited partnership, Interphase Corp.,
James F. Peters, as Trustee of the Gnolaum Unitrust,
Cross-Counterclaimants, Cross-Defendants, Crossclaim
Defendants, Appellees, Cross-Appellants.
Harold Masunaga, Marion Harada, Ukio Ayabe, Lyle Muller,
Charles Higashi, Joseph Green, and William Ohara,
Amici Curiae.
 Nos. 86-1156, 86-1157 and 86-1202.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 16, 1990.
Rehearing Denied April 25, 1990.
 
 Steven W. Snarr (Michael E. Talbot with him on the brief), Salt Lake City, Utah, for Cascade Energy and Metals Corp.
 Richard A. Love of Reish & Luftman, Los Angeles, Cal. (George M. Haley of Haley & Stolebarger, Salt Lake City, Utah, with him on the brief), for Jeffery G. Banks, Kenneth Caldwell, Coastal Computer Investments, Elmer J. Davis, David G. Henry, Roger A. Mann, Mann Caldwell Partnership, Robert A. Nickerson, Peter P. Samarin, Patricia Stoltenberg, Herbert W. Stoltenberg, Edwin Stoltenberg, Delford Ashley, George Slater, Patricia Slater, Robert Doub, Sam Hambarian, Alyce Hambarian, and Lionel Ascher (the "Associate Defendants").
 Richard A. Love of Reish & Luftman, Los Angeles, Cal., for Samuel Harmatz, Bernard Hodowski, A.C. Nejedly, Chris Waugh, H.E. Moses, R.E. Donahey, Grace V. Duncan, Elliot Weinberg, and Harmatz and Hodowski partnership (the "Gold Technics Defendants").
 A. Park Smoot, Salt Lake City, Utah, for W. David Weston.
 Ronald S. George, Pocatello, Idaho, for Telegraph Mine Ltd.
 Lynn P. Heward, Salt Lake City, Utah, for Rex Montis Silver Co.
 Delwin T. Pond, Salt Lake City, Utah, for Gnolaum Unitrust.
 Delwin T. Pond, Salt Lake City, Utah, for amici curiae.
 Before McKAY, BARRETT, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This diversity case involves a dispute over a gold mine. The basic controversy is between the mine's principal promoters (W. David Weston and his affiliated entities) and a group of investors in the mine.
 
 
 2
 The Weston entities basically appeal from the district court's determination after a bench trial that they breached their fiduciary duties to the investors by concealing large cost overruns during the mine's development and by then trying to assess the investors for the overruns. The Weston entities also challenge the district court's decision to pierce the corporate veil among the Weston entities and to nullify the investors' obligation to make additional payments on various promissory notes. The investors generally appeal from the district court's holding that their interests in the mine were not "securities" under federal and state securities laws and that the Weston entities did not defraud the investors into purchasing their interests at the outset.
 
 
 3
 We affirm in part, reverse in part, and remand.
 
 PARTIES
 
 4
 Plaintiff Cascade Energy and Metals Corporation ("Cascade") is a Nevada corporation which owned and managed a gold mine. During the time relevant here, Weston owned or controlled over 50 percent of Cascade's stock and served as its president. Six other entities affiliated with Weston ultimately became parties to this lawsuit: Telegraph Mine Limited ("Telegraph Limited"), a Utah limited partnership having Cascade as its general partner; Rex Montis Silver Co. ("Rex Montis"), a Utah corporation, 41 percent of whose stock was owned by Weston; Interphase Corporation ("Interphase"), a Utah corporation, 77 percent of whose stock was owned by Weston; Gnolaum Unitrust, a revocable trust established by Weston for the benefit of himself, his wife, and his children; Gold Technics, Ltd. ("Gold Technics"), a California limited partnership having Rex Montis as its general partner; and Telegraph Mine Joint Venture, a joint venture among Telegraph Limited, Rex Montis, and Gold Technics.
 
 
 5
 This case started when Cascade filed suit in the United States District Court for the District of Utah against various investors in the gold mine (the "Associate Defendants"), seeking to assess them for additional capital contributions.[1] Cascade also sued eight limited partners of Gold Technics (the "Gold Technics Defendants") for allegedly interfering with the Associate Defendants' purported duty to pay additional capital assessments.[2] Another group of investors in the gold mine, who generally support Weston and Cascade in this litigation, are not parties but have been allowed to appear in this Court and below as amici curiae.[3]
 
 
 6
 The Associate Defendants and the Gold Technics Defendants (collectively, the "defendants") counterclaimed against Cascade and brought additional claims against Weston and his affiliated entities.[4] Weston and his entities, in turn, counterclaimed against the defendants.
 
 BACKGROUND
 
 7
 The following diagram summarizes the relationships among the principal parties at relevant times:
 
 
 8
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE----------
 
 
 9
 The following recitation of facts is based upon the district court's findings, which we cannot conclude are clearly erroneous.
 
 
 10
 In 1974, Cascade purchased the "Telegraph" gold mine, located in eastern California. In 1976, Cascade leased the mine to Telegraph Limited, a Utah limited partnership controlled by Weston having Cascade as its general partner. In January 1979, Telegraph Limited sold a 40 percent interest in the mine lease to Gold Technics for $150,000 ($50,000 in cash with the balance in an installment note). Gold Technics is a California limited partnership established by two accountants (Bernard Harmatz and Samuel Hodowski) and a group of their accounting clients and Weston.
 
 
 11
 At that time, in January 1979, Telegraph Limited (as 60 percent owner) and Gold Technics (as 40 percent owner) entered into a joint venture, the Telegraph Mine Joint Venture (the "Joint Venture"), to develop the mine. Cascade served as the manager of the Joint Venture.
 
 
 12
 In September 1980, Gold Technics sold three-fourths of its 40 percent interest in the mine to Rex Montis for 480,000 shares of unregistered Rex Montis stock. After the transaction, the mine lease and the Joint Venture were owned 60 percent by Telegraph Limited, 30 percent by Rex Montis, and 10 percent by Gold Technics. The transaction was contingent upon the completion of the sale of 35 working interests in the mine to private investors and upon Rex Montis' compliance with California's regulations governing transactions in unregistered securities. However, Rex Montis never obtained approval of the sale from the California Corporations Commissioner and never physically conveyed the Rex Montis shares to Gold Technics.
 
 
 13
 In December 1980, the Joint Venture (through Cascade as manager) sold 35 undivided working interests in the mine to various individual and corporate investors. The investors collectively were known as the Telegraph Mining Associates (the "Associates"). As part of the transaction, the Associates agreed to hire Cascade (of which Weston was president) to develop and operate the mine on the Associates' behalf. The Associates further agreed to pay the Joint Venture, as sublessee of the mine, an "annual minimum royalty" of $74,285 per 1/35th unit, consisting of $30,000 in cash and a $44,285 recourse royalty note.[5] That amount, $74,285, was to be paid each year, regardless of whether there was any mineral production.[6] However, by the third year, "production proceeds" were supposed to pay all or most of the $74,285-per-unit minimum royalty payment.
 
 
 14
 The sale of the 35 units raised $1.05 million immediately, of which $800,000 was to be lent back to the Associates by the Joint Venture as a development loan. Cascade, acting as the Associates' project manager, was to use the $800,000 development loan to develop the mine for the Associates and to prepare the site for gold production.[7]
 
 
 15
 The Associates who purchased the 35 units fell generally into four groups: (1) persons affiliated with Gold Technics, and their friends and acquaintances; (2) other persons whom Weston solicited at a gold convention and elsewhere; (3) a group of Hawaiian investors who were participants in some of Weston's other enterprises (and who are not parties to this appeal but have filed an amicus brief stating their position); and (4) Weston himself and some of his affiliated entities, including his revocable trust, Gnolaum Unitrust. In this litigation, the first and second Associate groups are allied against Weston, and the third and fourth Associate groups are allied with him.
 
 
 16
 The offering memorandum for the 35 working interests contained charts showing income and cash flow projections. Those projections forecast that the Associates would never have to contribute additional cash to repay the promissory notes or the $800,000 development loan because by the third year, operating profits from the project would be more than enough to satisfy those obligations.[8]
 
 
 17
 However, problems with the mine arose almost immediately. The original plan was to sink a 400 foot shaft and engage in underground mining. The district court found that as of July 1981, Weston (as president of Cascade, the mine's operating manager) realized that the $800,000 development loan was not enough money to sink the shaft and to get the mine into production. (Accounting Findings 14.) So, according to the district court, Weston implemented a plan for obtaining more money from the Associates. Instead of beginning underground operations, Weston persuaded the Associates to generate some quick profits by letting Cascade perform surface mining and then use a "heap leaching" method to get the gold out of the ore. In general, heap leaching entails piling up a mound of ore and soaking it with a cyanide solution, and then processing the gold-laden solution that gradually seeps out.
 
 
 18
 By September 1981, the heap leaching method had not produced any gold and some Associates started to get suspicious. Several Associates flew to Cascade's headquarters in Salt Lake City and inspected the books. Although they found some inconsistencies and evidence that Weston was using a portion of their money for his personal affairs, they were largely persuaded by his explanations and by his insistence that core samples showed that there really was gold in the ore. The Associates then set up a management committee to oversee the operation's finances. They instituted a two-signature check policy, requiring the committee's permission before Cascade wrote major checks.
 
 
 19
 Months passed. To make a long story short, costs kept escalating, production was delayed month after month, assays revealed that there was not much gold in the ore that Cascade spent its time surface mining, the heap leaching method never produced much gold, and Cascade rapidly consumed the $800,000 development loan with little or no gold to show for it and without even starting to sink a shaft. All the while, Weston kept telling the Associates that if they waited just a few more months and if they put just a little more money into the operation, the heap leaching system would produce some gold and the project would get off the ground.
 
 
 20
 By February 1982, the $800,000 development loan had been consumed and there still was no gold production. Weston informed the Associates that he and Cascade were loaning the project money to keep it afloat. He told the Associates that he was going to assess them for all of the "development costs" beyond the initial $800,000. The proposed assessments were in addition to the $74,285 minimum royalty payment which the Associates were obligated to make each year to the Joint Venture. Weston started sending out assessment invoices. Some Associates paid the invoices, others did not. None of the Associates at that time raised the contention that assessments were not allowed under the Joint Operating Agreement. The district court found that many Associates who paid their assessments did so not because they felt obligated to, but rather because they were told that they soon would be repaid from the promised gold production.
 
 
 21
 By July 1982, there still was no gold. Three of the Associates went to the mine and sampled the heap leaching pile themselves. After assaying the samples, they found that the pile had little gold in it and that Weston and Cascade had been mining poor-quality ore. Meanwhile, the assessments kept building.
 
 
 22
 In August 1982, Weston held an Associates meeting and insisted that the Associates pay their assessments. He told them that the project had to have more money and could become profitable with just 60 more days of heap leaching. (Exh. 93-A, meeting transcript at 25, 30-31.) Some Associates paid their assessments after that meeting, others did not.
 
 
 23
 In September 1982, the Associates ordered Weston to stop crushing ore because the crushing operation was the biggest expense and there still was no gold. The Associates sought to put limits on the quality of ore mined so that they would not have to pay for Cascade's mining of low-quality ore.
 
 
 24
 In November 1982, the Hawaiian investors (who were associated with some of Weston's other ventures) withdrew their consent from the Associates' management committee that had been formed to represent the Associates' interests. The management committee then disbanded for lack of a majority.
 
 
 25
 In December 1982, the Associates (other than the Hawaiian Associates and the Weston-affiliated Associates) informed Weston that under the Joint Operating Agreement, the Associates could not be assessed for additional development or production costs beyond the initial $800,000 development loan. Cascade then filed suit in the district court against the Associates who had not paid their assessments (that is, the Associate Defendants). The Associate Defendants counterclaimed against Cascade and brought third-party claims against Weston and the other Weston entities for fraud, breach of fiduciary duty, and securities violations. Then essentially everyone counterclaimed and cross-claimed against everyone else.[9]
 
 
 26
 After a lengthy bench trial on liability issues and a later bench trial on accounting issues, the district court held in substance that: (1) Weston and his entities had not defrauded the Associates into buying their working interests; (2) the Joint Operating Agreement did not permit the assessment of the Associates for additional cash needs beyond the initial $800,000 development loan; (3) after the working interests were sold, Weston and his entities had breached their fiduciary duties and had acted in bad faith by concealing the fact that there was no way for the mine to be put into production for only $800,000 and by trying to extract additional cash from the Associate Defendants through so-called assessments; (4) Weston and his entities had misappropriated large sums from the Joint Venture and had converted the Joint Venture's funds for their own use; and (5) Weston, Cascade, and Weston's other entities were alter egos of each other.
 
 
 27
 As a remedy, the district court ordered that: (1) Weston and Cascade account for $629,474.63 in funds misappropriated from the Joint Venture (thus giving Gold Technics, as a 10 percent owner of the Joint Venture, $62,947.46); (2) Weston and Cascade return $70,449.68 in assessments wrongfully collected from the Associate Defendants; (3) Weston and Cascade pay $265,000 in attorneys fees to the Associate Defendants for bringing the meritless suit to assess them for additional mining costs ($240,000 to the Associate Defendants and $25,000 to those of the Gold Technics' Defendants who were Associates); (4) the Associate Defendants' working interests be terminated and the Associate Defendants be relieved of any further obligation to make royalty payments or to perform on the promissory notes given for past royalty payments; (5) the Associate Defendants be relieved of any obligation to repay the $800,000 development loan; (6) the Joint Venture be terminated and dissolved, and Gold Technics and its limited partners forfeit all interest in the mine lease and the Joint Venture; (7) Weston and Cascade pay Gold Technics $5,000 as nominal damages for the "wrongful frustration and de facto termination" of the Joint Venture; (8) Gold Technics be terminated and dissolved, and all damages and stock owed to Gold Technics ($62,947.46 in damages from the accounting, $5,000 in nominal damages, and the 480,000 shares of unregistered Rex Montis stock held by Rex Montis but belonging to Gold Technics) be distributed directly to Gold Technics' limited partners in proportion to their interests. Because of the district court's alter ego finding, the judgments against Weston, Cascade, and the other Weston entities ran against each of them.
 
 ISSUES ON APPEAL
 
 28
 Weston, Cascade, and the other Weston entities raise the following issues on appeal:
 
 
 29
 1. Whether the district court erred in holding that the Joint Operating Agreement between the Associates and Cascade did not require the Associates to make any cash capital contributions for development and production costs beyond the initial $800,000 development loan.
 
 
 30
 2. Whether the district court erred in holding that Weston and Cascade breached their fiduciary duties to the Associate Defendants by learning early on that the mine could not be put into production for $800,000, concealing that fact, and then attempting to assess the Associate Defendants for additional capital.
 
 
 31
 3. Whether the district court erred in holding that Weston and Cascade had failed to account for large sums that Weston and Cascade allegedly misappropriated from the Joint Venture.
 
 
 32
 4. Whether the district court erred in holding that Telegraph Limited, Rex Montis, Interphase, and Gnolaum Unitrust all were alter egos of Weston and Cascade.
 
 
 33
 5. Whether the district court erred in relieving the Associate Defendants of all liability for future mine royalty payments and for promissory notes given for past royalty payments.
 
 
 34
 6. Whether the district court erred in holding that the Associate Defendants were relieved of all liability for the $800,000 development loan which the Joint Venture had made to the Associates from the proceeds of the working-interests sale.
 
 
 35
 7. Whether the district court erred in awarding attorneys' fees to the Associate Defendants for the alleged bad faith of Weston and Cascade in filing suit to assess the Associate Defendants for additional cash capital contributions.
 
 
 36
 8. Whether the district court erred in holding that the Associate Defendants and the Gold Technics Defendants did not engage in any tortious conduct or breach any fiduciary duties owed to Weston's revocable trust, Gnolaum Unitrust (which owned one of the 35 working interests), or to the other Weston entities.
 
 
 37
 The Associate Defendants (and those of the Gold Technics Defendants who also are Associates) raise the following issues on appeal:
 
 
 38
 1. Whether the district court erred in holding that the 35 working interests in the mine sold to the Associates were not securities under federal and California securities laws.
 
 
 39
 2. Whether the district court erred in holding that Weston and his entities were not liable for fraud or negligent misrepresentation in the offering of the 35 working interests.
 
 
 40
 3. Whether the district court erred in holding that the Associates could not recover from the Weston entities for adverse tax consequences stemming from the failure of the mining operation.
 
 
 41
 The Gold Technics Defendants raise the following issues on appeal:
 
 
 42
 1. Whether the district court erred in refusing to rescind Gold Technics' September 1980 sale of a 30 percent interest in the mine to Rex Montis in exchange for 480,000 shares of Rex Montis stock.
 
 
 43
 2. Whether the district court erred in failing to award damages for the conversion of 38,000 shares of Rex Montis stock which belonged to Gold Technics but which Weston had pledged to a bank for a loan to Cascade.
 
 
 44
 3. Whether the district court erred in failing to award additional damages for the termination of the Joint Venture.
 
 
 45
 4. Whether the district court erred in failing to award any monetary compensation to one of Gold Technics' limited partners, R.E. Donahey.
 
 DISCUSSION
 I. ISSUES RAISED BY WESTON ENTITIES
 
 46
 A. Assessments Under Operating Agreement (Weston Entities' Issue No. 1)
 
 
 47
 The district court held that the Joint Operating Agreement between the Associates and Cascade did not require the Associates to make any cash capital contributions for development and production costs beyond the initial $800,000 development loan. We agree.
 
 
 48
 Paragraph 13(c) of the Agreement specifically limited the Associates' liability for additional payments to each Associate's share of the minerals that were actually produced and removed from the mine:
 
 
 49
 Notwithstanding anything to the contrary contained herein, the Operating Manager [Cascade] shall have no authority, express or implied, to enter into any commitment or obligation on behalf of the Purchasers [that is, the Associates] or otherwise do anything which would subject the Purchasers, or any of them, to any liability in excess of the Purchasers' respective interests in the minerals mined, milled and removed from the Property and their interest in any proceeds from the sale of said minerals.
 
 
 50
 (Emphasis added.) In other words, pursuant to paragraph 13(c), the Associates could not be required to make additional cash contributions to the enterprise when no gold was produced.
 
 
 51
 However, Weston argues that the Agreement's prior paragraph, paragraph 13(b), which provided that the Associates were liable for all costs of the mine, obligated the Associates to make additional cash contributions:
 
 
 52
 All costs and liabilities incurred in the exploration and development of the Property and the mining, milling and removal of ore therefrom shall be borne and paid for by the Purchasers in proportion to their interests.
 
 
 53
 In our view, paragraphs 13(b) and 13(c), when read together, provided that the Associates were required to pay additional development and production costs out of their share of the contemplated gold production. Under the plain language of paragraph 13(c)--which begins "Notwithstanding anything to the contrary contained herein"--the Associates are not responsible for additional payments beyond each Associate's share of the minerals that were actually produced and removed from the mine.
 
 
 54
 That interpretation of the Agreement is confirmed by parole evidence heard by the district court. Although Weston testified that he thought cash assessments were proper under paragraph 13(c) (see, e.g., Tr. 415-20), the lawyer who drafted the Agreement (who had been hired by Weston to handle the legal work for the transaction) testified that paragraph 13(c) was intended to mean what it said: the Associates could not be assessed under the Agreement for additional cash contributions beyond the value of the minerals produced. (Williams Dep. at 64-66.) Thus, as the district court held, Weston's assertion that the project collapsed because the Associate Defendants wrongly failed to pay the additional cash assessments, is without merit. The Associate Defendants were under no obligation to do so under the express terms of the Agreement.
 
 
 55
 B. Breach Of Fiduciary Duty (Weston Entities' Issue No. 2)
 
 
 56
 The district court held that Weston and Cascade breached their fiduciary duties to the Associate Defendants by quickly learning early on that the mine could not be put into production for $800,000, concealing that fact, and then attempting to assess the Associate Defendants for additional capital. (Findings 100-01.) In particular, the district court held that Weston (as Cascade's president) acted in bad faith by trying to squeeze additional money from the Associate Defendants for a project that Weston knew was not economically feasible. The district court found that Weston did not start out with fraudulent intentions, but that by at least July 1981, Weston knew that the project could not be successful without more cash beyond the $800,000 development loan, and he embarked upon a scheme to get it:
 
 
 57
 Adhering to my interlocutory findings concerning the good faith of Weston in connection with the original offering in reliance upon the existing reports of geologists and his analysis of and projections from them as to underground operations, I am now clearly convinced that Weston's bad-faith conduct had its inception on or prior to the writing of July 28, 1981, and that a breach of Cascade's implied covenant of fair and honest dealing as a fiduciary toward the Associates continued from that time to and including the institution of the present action....
 
 
 58
 (Accounting Findings 14-15.)
 
 
 59
 Our standard for reviewing the district court's factual findings in an action tried without a jury is whether the findings are clearly erroneous. Fed.R.Civ.P. 52(a). In applying that standard, we are required to give "due regard ... to the opportunity of the trial court to judge ... the credibility of the witnesses." Id. After reviewing the record here, we cannot say that the district court's finding that Weston and Cascade breached their fiduciary duties to the Associate Defendants is clearly erroneous.
 
 
 60
 The following evidence supports the district court's finding that Weston and Cascade acted in bad faith in trying to assess the Associate Defendants.
 
 
 61
 First, the Joint Operating Agreement is clear on its face. See Part I.A above. Cascade had no power to subject the Associates to any liability in excess of their "respective interests in the minerals mined, milled and removed from the Property." (Agreement p 13(c); emphasis added.) If no minerals were removed from the property, then the Associate Defendants could have no additional liability.
 
 
 62
 Second, Weston filed suit seeking the assessments knowing that the lawyer who principally drafted the Agreement and who was responsible for the basic structure of the transaction, Lawrence Williams, had stated that the Agreement prohibited any cash assessment of the Associates. On December 2, 1982, before the lawsuit was filed, one of the Associates wrote a letter to Weston's attorney and to Weston stating that Williams had confirmed "in no uncertain terms that the agreements do not--repeat--do not give Cascade or anyone else the right to demand assessments from the Associates." (Exh. 131.04.) Weston filed suit nonetheless.
 
 
 63
 Third, the breach of fiduciary duty by Weston and Cascade also was evidenced by their failure to reveal promptly and candidly that the $800,000 development loan was not sufficient to get the mine into production. Sometime before the $800,000 was exhausted, Weston and Cascade were obligated to step forward and tell the Associate Defendants that: (1) the Offering Memorandum's projection that $800,000 was sufficient to sink a 400 foot mine shaft and to get the mine into production was wrong; (2) additional capital was required to make the project succeed; and (3) the Associates had various options, such as borrowing money, selling additional working interests, making additional capital contributions, or terminating the project. Weston and Cascade revealed none of those things, but instead sought to impose upon the Associate Defendants their mandatory-assessment theory--which happened to be the solution that was most favorable to Weston and Cascade--while continuing to mouth the increasingly frail hope that gold production was just around the corner.
 
 
 64
 Fourth, as the district court held, Weston's bad faith was shown by the fact that as early as July 1981, Weston was recharacterizing certain key definitions in a way that would support his later argument that the offering documents contemplated a gap between the mine's development phase and the production phase, during which time the Associates assumed unlimited cash liability. In particular, although the offering documents consistently described the $800,000 loan as a "Development Loan," Weston's July 1981 correspondence with the Associates started calling it a "pre-development loan." See Exh. 39, July 28, 1989 letter to Associates. Moreover, although the offering memorandum's financial projections defined "Preproduction Expenses" to be all funds necessary "to place the Telegraph Mine at Production Phase," and stated that those expenses were to total $800,000 (see Financial Projections, Note D), Weston's July 1981 pro forma divorced "preproduction expenses" from the $800,000 figure and showed them continuing long after production was to begin. See Exh. 46.
 
 
 65
 Fifth, when Weston first suggested that the Associates should contribute additional cash to the project, he portrayed the requests not as mandatory assessments, but rather as voluntary, short-term loans to be repaid quickly from gold production. On April 15, 1982, Weston wrote a letter to the Associates notifying them that the "pre-development loan funds plus the interest accrued thereon has now been expended in the work of pre-development." (Exh. 41.03.) The letter stated that the Associates would be "invoiced directly" for future "production expenses," and that each Associate's share of the expected gold production would be sold to pay the billings if the invoices were not paid in cash:
 
 
 66
 [U]nless arrangements are made to pay for the costs of mining and processing, royalties, taxes, and such other expenses as are incurred in the operation, the costs of mining will be billed to [the Associates] directly on a quarterly basis and sufficient ounces of the production necessary to cover these costs will be sold.
 
 
 67
 Id.
 
 
 68
 Thus, as the district court held, the "first mention of assessability for the cost of production" was not grounded on the mandatory nature of the assessments, but rather "on the theory that if not paid, deficiencies would be taken care of out of the sale of the gold." (Findings 54.) Weston was still proffering that view as late as August 1982 when, at an Associates meeting, Weston displayed some small souvenir bars of gold from the first production of the mine and stated that they would be distributed to those Associates who paid their second quarter assessment billing. Weston did not resort to his view that the assessments were mandatory, in late 1982, until his attempts at coaxing largely failed. Those facts indicate that Weston did not really think that the assessments were mandatory when Cascade sued the Associate Defendants for payment.
 
 
 69
 In summary, we by no means are holding that a fiduciary's decision to press an arguable contract interpretation that turns out to be incorrect constitutes a breach of fiduciary duty. We hold only that there was sufficient evidence to support the district court's finding that Weston's interpretation of the contract was patently wrong, that Weston knew it was wrong, that Weston concealed that fact from the Associate Defendants, and that Weston pushed the interpretation nonetheless in order to benefit himself and Cascade at the expense of those to whom he owed a fiduciary duty. Those actions constituted a fiduciary breach.
 
 
 70
 C. Accounting Issues (Weston Entities' Issue No. 3)
 
 
 71
 The district court held that Weston and Cascade and certain other Weston entities misappropriated or otherwise failed to account for $629,474.63 belonging to the Joint Venture. The district court's accounting concerned the misappropriation claims of only the Gold Technics Defendants and not those of the Associate Defendants.[10]
 
 
 72
 There is no dispute that Cascade, as managing agent of the Joint Venture, owed the venturers the duty to account properly for all sums entrusted to it. Nor does Cascade dispute that once Gold Technics established its right to an accounting, the burden of proof shifted to Cascade to show how the Joint Venture's funds were expended and to establish any credits to which Cascade might be entitled. Cf. Restatement (Second) Trusts Sec. 172 comment b at 377 (1959).
 
 
 73
 After a full trial concerning the accounting, the district court held that Weston and Cascade had not provided adequate explanations for their handling of the five items listed above totalling $629,474.63.[11] On review, we must uphold the district court's accounting findings unless they are clearly erroneous. Fed.R.Civ.P. 52(a).
 
 
 74
 We agree with the district court that Cascade has failed to meet its burden of proof on four of the five accounting issues. Indeed, as discussed below, the evidence presented at trial showed that Weston regularly dipped into the Joint Venture's checking account whenever one of his entities needed cash, and that he freely shuffled cash among his various entities with essentially no contemporaneous documentation.
 
 1. $36,943.73 depreciation expense
 
 75
 In his original Affidavit Attesting Plaintiff's Fiduciary Accounting, Weston swore that $36,943.73 of that money was spent for "Depreciation." (R. 310 at 5.) The Gold Technics Defendants then submitted interrogatories asking how any part of the Joint Venture's cash possibly could have been spent on a non-cash item such as depreciation. In response, Weston filed an amended affidavit in which he allocated the $36,943.73 to two other line items in his accounting, $28,156 to "Other" and the remainder to "Offering Expense." (R. 321 at 2.)
 
 
 76
 At the accounting trial, Weston was given the opportunity to explain how he had transformed $36,943.73 of "depreciation" into cash expenditures and why the newly-found cash expenditures were not included in his original accounting. (Accounting Tr. 44-49.) We agree with the district court that Weston's explanations were inadequate. He provided no itemization of the $28,156 that he allocated to "Other." (Id. at 46.) He described his increasing of the "Offering Expense" category as an after-the-fact "adjustment that I felt went to the offering expenses." (Id. at 48.) When the district court pressed Weston on the issue of whether his new figure for offering expenses comported with the amount listed as a deduction on Cascade's 1980 tax return, Weston conceded that he did not know and had not checked. (Id. at 48-49.)
 
 
 77
 The district court properly ordered Weston and Cascade to repay the $36,943.73.
 
 
 78
 2. $335,722.20 transfer to Cascade and Interphase
 
 
 79
 In its response to defendants' various accounting interrogatories, Cascade submitted its December 31, 1981 balance sheet showing that Cascade owed the Joint Venture $305,041.01 as of that date. (R. 322 Exh. "Assoc. # 23.") That $305,041.01 item was listed on the balance sheet as a note payable from Cascade to the Joint Venture.
 
 
 80
 At the accounting trial, Weston admitted that Cascade and other Weston entities had taken large sums from the Joint Venture but argued that (1) in the case of Cascade, they totalled $270,200.00 and not $305,041.01; and (2) they constituted capital distributions that need not be reimbursed. The district court held that (1) Cascade's debt to the Joint Venture was $305,041.01 and that Cascade had not adequately justified its contention that it owed only $270,200.00; (2) there was an additional $30,681.89 (which was listed on Cascade's balance sheet as owing from Interphase to Cascade) that Cascade did not demonstrate came from sources other than the Joint Venture;[12] and (3) Cascade's "failure to account for the foregoing charges on the theory of 'capital distributions' is an improper and self-serving attempt to avoid accountability for the balances [Cascade and the other Weston entities] owe" (Accounting Findings 22).
 
 
 81
 On appeal, Cascade asserts, first, that the district court should not have relied on Cascade's corporate accounting records because they "were prepared for Cascade and not the [Joint Venture]" and because they "were not received into evidence and were not a part of the court's file." (Cascade Br. at 45.) Those contentions are without merit. The fact that Cascade's balance sheet was prepared for Cascade is not relevant to the issue of whether it evidences a bonafide debt owing from Cascade to the Joint Venture. Cascade's assertion that the documents were not properly before the court is belied by the record. Cascade itself filed the documents with the district court as an exhibit to its accounting responses. (R. 322 Exh. "Assoc. # 23.") Weston testified about the documents at length during the accounting trial. E.g., Accounting Tr. 87, 151-52. Moreover, the district court invited Cascade to present any clarifying evidence that it had, but Cascade chose not to do so. (Accounting Tr. 183-84, 305-06.)
 
 
 82
 Second, with regard to the $30,681.89 that the district court found owing to the Joint Venture from sums transferred between Interphase and Cascade, Cascade merely responds on appeal that "Cascade's ledger account No. 2105 'Interphase N/P' is unrelated to the [Joint Venture]." (Cascade Br. at 45; see also Rex Montis Br. at 18.) Cascade does not provide any record citation for its assertion that the $30,681.89 did not come from the Joint Venture. The record shows that Cascade caused large amounts of money to be transferred from the Joint Venture checking account to Cascade. (R. 322 at 69.) Cascade, in turn, issued numerous checks to Interphase in round-number denominations, such as $1000, $5000, or $10,000. (R. 322 at 82-83; Accounting Tr. 97.) Cascade had hired Interphase to handle the accounting and payroll affairs of Cascade, the Joint Venture, and Weston's other entities. The sums transferred from Cascade to Interphase were transferred either without any invoices being prepared at all or with invoices being prepared after the transaction had taken place. (Accounting Tr. 97.) The funds were transferred into one of Interphase's bank accounts and commingled with the other funds there. (Id. 125.) It was Cascade's burden to show that all funds transferred between Cascade and Interphase were not related to the Joint Venture or else were spent on legitimate Joint Venture expenses. Cascade failed to do so.[13]
 
 
 83
 Third, Cascade asserts that much of the money that Cascade and the other Weston entities took from the Joint Venture can be explained as capital distributions. The district court found that explanation to be an after-the-fact rationalization, and we agree. Cascade argues that in February 1981, the Joint Venture issued two checks totalling $40,949 to or for the benefit of Gold Technics. Cascade contends that the $40,949 given to Gold Technics as 10 percent owner of the venture was a capital distribution and that, consequently, Telegraph Limited as 60 percent owner was entitled to $270,200 and Rex Montis as 30 percent owner was entitled to $91,807.55. (Cascade Br. at 45-46.)[14]
 
 
 84
 Contrary to Cascade's contention, the evidence at the accounting trial showed that (1) neither the 1980 nor the 1981 tax return for the Joint Venture, both of which were prepared by Cascade, reported the $40,949 payment to Gold Technics as a capital distribution (Accounting Tr. 56-57); (2) neither the 1980 nor the 1981 financial statement of the Joint Venture, both of which were prepared by Cascade, treated the $40,949 payment as a capital distribution (Accounting Tr. 58-59); (3) one of the checks involved in the $40,949 transaction indicated on its stub that $12,255.88 was a repayment to Gold Technics for money advanced by it as part of the Associates' offering (Accounting Tr. 65); (4) another of the checks involved in the transaction indicated on its stub that the remaining $28,723.16 was a loan (Accounting Tr. 68-69; R. 322 Exh. THV7); and (5) Gold Technics' 1981 financial statement, which was prepared by Weston's accountant, treated the $28,723.16 as a loan (Accounting Tr. 73-74). Therefore, the district court was justified in concluding that Gold Technics had not received any capital distributions and that all money taken from the Joint Venture by Cascade and the other Weston entities should be returned.[15]
 
 3. $81,308.40 transfer to Interphase
 
 85
 In 1981, Cascade caused the Joint Venture to transfer $81,308.40 to Interphase in order to pay for the construction of Interphase's office building. (Accounting Tr. 155.) On appeal, Cascade's only explanation for the transfer is that it constituted a capital distribution, although Cascade nowhere explains how Interphase, which had no ownership interest in the Joint Venture, could ever be entitled to a capital distribution. In any event, for the reasons stated in Part I.C.2 above, Interphase and the other Weston entities were not entitled to any capital distributions from the Joint Venture. Because the only explanation offered by Interphase is not supportable, the district court properly ordered Cascade and Weston, who improperly authorized the transfer, and Interphase to repay the $81,308.40.
 
 4. $10,500 transfer to Rex Montis
 
 86
 In November 1981, Cascade caused the Joint Venture to transfer $10,500 to Rex Montis. At trial, Weston's only explanation for the transfer was that it was a capital distribution. (Accounting Tr. 201; R. 322 at 69.) For the reasons stated in Part I.C.2 above, Rex Montis was not entitled to any capital distributions and must repay the money that it took. The district court properly ordered Cascade and Weston, who improperly authorized the transfer, and Rex Montis to return the $10,500.
 
 
 87
 5. $165,000 owed for defaulted Associate interests
 
 
 88
 The district court held that Cascade had not accounted for $165,000 in royalty payments that Cascade and Interphase owed to the Joint Venture in connection with Cascade's 1982 purchase of 4 1/2 units of defaulted Associate interests and Interphase's purchase of one defaulted unit. In Cascade's responses to Gold Technics' accounting interrogatories, Cascade produced photocopies of checks and bank records showing that it indeed had paid $135,000 into the Joint Venture's bank account and that Interphase had paid $30,000. (R. 322 Exh. "TJV 13.")
 
 
 89
 On appeal, the Gold Technics Defendants do not challenge Cascade's assertion that checks totalling $165,000 were deposited into the Joint Venture's bank account, but rather contend that Cascade failed to submit "any evidence of the source of the funds purportedly transferred." (Gold Technics Br. at 9, emphasis in original.) The Gold Technics Defendants ask rhetorically, "what 'payment' is there if $135,000 of the Associates' or [the Joint Venture's] funds are taken by Cascade and then checks written by it back into [the Joint Venture]?" (Id.)
 
 
 90
 Despite Gold Technics' point, we conclude that the $629,474.63 awarded by the district court double-counts the $165,000. The $165,000 payment could have come from only two sources: either from the Joint Venture or from non-Joint Venture sources (or a combination thereof). If it came from non-Joint Venture sources, then the Joint Venture is entitled to receive only $464,474.63 ($629,474.63 less $165,000) because only $464,474.63 was wrongfully transferred from the venture. On the other hand, if the $165,000 came from the Joint Venture, then the venture still is entitled to only $464,474.63 because $165,000 of the $629,474.63 taken from it was repaid.
 
 
 91
 Therefore, because the evidence shows that Cascade and Interphase in fact paid $165,000 to the Joint Venture, the accounting award should be reduced from $629,474.63 to $464,474.63, and the Gold Technics Defendants should receive their proportionate share of the smaller sum.
 
 
 92
 D. Corporate Veil Issues (Weston Entities' Issue No. 4)
 
 
 93
 The district court held that Weston and the entities affiliated with him were alter egos of each other and were jointly and severally liable for the entire judgment in this case:
 
 
 94
 Interphase, Gold Technics, Telegraph Mine, Ltd., Telegraph Mine Joint Venture, Cascade, Gnolaum Unitrust, and Rex Montis are instrumentalities of Weston which were and are used by Weston for his own personal purposes. Weston disregarded the purported separateness of the entities and commingled the funds of the entities and his own. He dominated their boards of directors and management, and has been and is able to single-handedly transfer assets from one entity to another and to and from himself as he chooses, with the acquiescence and consent of all. It would be inequitable and a fraud on the opposing parties if any judgment against Weston, Cascade, or Rex Montis were not also against these alter ego entities. Accordingly, the judgments to be awarded herein for balances due, restitution, damages and costs and attorney fees should run not only against Cascade and Weston but against Interphase, Telegraph Mine Limited, Rex Montis and Gnolaum Unitrust.
 
 
 95
 (Accounting Finding 35 as amended Nov. 19, 1985; emphasis added.)
 
 
 96
 At the outset, we need to distinguish between what the district court held regarding corporate veil issues and what it did not hold.
 
 
 97
 First, as we read the district court's findings, the district court did not pierce the corporate veil of Cascade itself, largely because it had no reason to do so.[16] The district court held that both Cascade and its principal officer and shareholder, Weston, were primarily liable for breaching fiduciary duties owed to the Associates and to the Joint Venture. See, e.g., Accounting Findings 26-27 ("[T]he judgments to be awarded herein ... run not only against Cascade and Weston, but against Interphase, Telegraph Mine Limited, Rex Montis and Gnolaum Unitrust") (emphasis added). The district court held Weston liable because he personally directed and participated in Cascade's fiduciary breaches. See Restatement Second of Torts Sec. 874 comment c at 300 (1977) ("A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused").
 
 
 98
 Second, the district court held that Rex Montis and three other Weston entities--Interphase, Telegraph Limited, and Gnolaum Unitrust--were alter egos of Weston and were liable for the entire judgment against Weston and Cascade. Although the district court did not explain its exact reasoning, the court apparently adopted a variant of the "reverse piercing" theory which led to the peculiar result of holding the corporation liable for the debts or torts of its controlling shareholder rather than the other way around.[17]
 
 
 99
 Here, the district court held that Rex Montis, Interphase, Telegraph Limited, and Gnolaum Unitrust all were liable for what Weston had done. Although we agree that each of those entities should be responsible for any wrongs that it committed and for any money that it took, we do not agree that those enterprises had no entity status separate from Weston.
 
 
 100
 Under Utah law, two circumstances must exist before a corporate entity can be disregarded:
 
 
 101
 (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.
 
 
 102
 Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979).[18]
 
 
 103
 1. Evidence supporting piercing regarding Rex Montis, Interphase, Telegraph Limited and Gnolaum Unitrust
 
 
 104
 The district court's decision to "reverse pierce" the entity veils of Rex Montis, Interphase, Telegraph Limited, and Gnolaum Unitrust was based on three key factual findings: (1) Weston dominated the boards of directors and the management of the four entities; (2) Weston was "single-handedly" able to transfer assets among the various entities and did so; and (3) Weston commingled the funds of the various entities, in the sense that when he transferred funds from one entity to another, the funds were deposited in the receiving entity's general bank account and were mixed with other funds there. (Accounting Findings 26.)
 
 
 105
 Having examined the record, we conclude that the district court's specific factual findings about how Weston operated his entities are justified. Weston wielded almost total control over the entities. That control was evidenced particularly by his control over each entity's finances. The record shows that Weston freely transferred cash from any entity that had it to any entity that needed it, whenever he wanted to do so. See, e.g., Accounting Tr. 290, 292, 311-12.
 
 
 106
 There is no question that Weston's bookkeeping system made it nearly impossible to provide defendants with a precise accounting. The district court properly concluded that, because the transferred funds were commingled with existing funds of the receiving entity, "[i]t was and is impossible to trace individual dollars from source to use." (Accounting Findings 9.) But the issue is whether those facts constitute sufficient grounds for disregarding the entity status of the entities in this case.
 
 2. Piercing analysis
 
 107
 We believe that a Utah court would not reverse pierce the entity veils of Rex Montis, Interphase, Telegraph Limited and Gnolaum Unitrust for a variety of reasons.
 
 
 108
 First, corporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities. See generally Dockstader v. Walker, 510 P.2d 526, 528 (Utah 1973) ("Ordinarily a corporation is regarded as a legal entity, separate and apart from its stockholders"); McCulloch Gas Transmission Co. v. Kansas-Nebraska Natural Gas Co., 768 F.2d 1199, 1200 (10th Cir.1985) ("The standards for the application of alter ego principles are high, and the imposition of liability notwithstanding the corporate shield is to be exercised reluctantly and cautiously.") (quoting 1 Fletcher Cyc. Corp. Sec. 41.10 (Rev. Vol.1974), emphasis added); G. Henn & J. Alexander, Laws of Corporations Sec. 146 at 347 (1983) ("limited liability is one of the principal objectives of incorporation").
 
 
 109
 Second, this case largely involves "reverse" piercing, and it is far from clear that Utah has adopted the doctrine of "reverse" piercing, much less this particular variant of "reverse piercing." Messick v. PHD Trucking Service, 678 P.2d 791, 793 (Utah 1984) does discuss the "reverse pierce" concept, calling it "little-recognized theory," but the Utah court ultimately declined to pierce the corporate veil there because of the failure to prove the traditional piercing the corporate veil elements of 1) non-observance of corporate formalities, 2) resulting in fraud, injustice or inequity. Thus, the court did not decide whether it would have pierced the corporate veil in the reverse context had those elements been present. The reverse-pierce theory presents many problems. It bypasses normal judgment-collection procedures, whereby judgment creditors attach the judgment debtor's shares in the corporation and not the corporation's assets. Moreover, to the extent that the corporation has other non-culpable shareholders, they obviously will be prejudiced if the corporation's assets can be attached directly. In contrast, in ordinary piercing cases, only the assets of the particular shareholder who is determined to be the corporation's alter ego are subject to attachment. See 1 Fletcher Cyc. Corp. Sec. 41.20 at 413 (1988 Supp.) ("[A] necessary element of the [alter ego] theory is that the fraud or inequity sought to be eliminated must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the abuse of corporate privilege--the doctrine cannot be applied to prejudice the rights of an innocent third party."). Absent a clear statement by the Supreme Court of Utah that it has adopted the variant reverse piercing theory urged upon us here, we are inclined to conclude that more traditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability.
 
 
 110
 Third, the analysis of corporate veil issues is different in a consensual transaction, such as a breach of contract case, than in a nonconsensual transaction, such as many tort cases:
 
 
 111
 The issues of public policy raised by tort claims bear little relationship to the issues raised by a contract claim. It is astonishing to find that this fundamental distinction is only dimly perceived by many courts, which indiscriminately cite and purport to apply tort precedents in contract cases and vice versa.
 
 
 112
 Hamilton, The Corporate Entity, 49 Tex.L.Rev. 979, 984-85 (1971). The obvious difference between consensual and nonconsensual transactions is that the claimants in consensual transactions generally have chosen the parties with whom they have dealt and have some ability, through personal guarantees, security agreements, or similar mechanisms, to protect themselves from loss. For example, the fact that a company is undercapitalized can be overcome in many contractual settings, because the parties can allocate the risk of financial failure as they see fit. But in nonconsensual cases, there is "no element of voluntary dealing, and the question is whether it is reasonable for businessmen to transfer a risk of loss or injury to members of the general public through the device of conducting business in the name of a corporation that may be marginally financed." Id.
 
 
 113
 Although breaches of fiduciary duty can be analyzed using tort principles (see Restatement (Second) of Torts Sec. 874 at 300 (1977)), the relationships among the parties in this case were basically voluntary and contractual. Cascade undertook the contractual obligation to manage the affairs of the Joint Venture and of the Associates, and consequently assumed the fiduciary duty of loyalty and duty of care inherent in any principal-agent relationship. See Restatement (Second) of Agency Secs. 1, 379, 387 (1958). The upshot is that Utah courts, like courts generally, appear less likely to pierce a corporate veil when a consensual, contract-like transaction is involved than when a nonconsensual, tort-like transaction is involved. See, e.g., Centurian Corp. v. Fiberchem, Inc., 562 P.2d 1252, 1253 (Utah 1977) (piercing not allowed in sales contract dispute); Dockstader v. Walker, 510 P.2d 526, 528 (Utah 1973) (piercing not allowed in employment contract dispute).[19]
 
 
 114
 Fourth, although Weston obviously used his entities to further his personal objectives, just as corporate parents often use their subsidiaries to achieve corporate goals, Weston held the entities out to the world as separate organizations. No one disputes that Weston's entities were validly organized and that de jure formation requirements were met. Indeed, Rex Montis was a publicly held company with over 850 shareholders. (Accounting Tr. 362.) The entities filed separate tax returns. E.g., Accounting Tr. 364-65. The entities held separate shareholder and director meetings. E.g., Exh. 381, Notice of Rex Montis Shareholders Meeting; Accounting Tr. 362-63. In sum, besides Weston's transfers of funds among his entities, the district court made no finding that the entities did not maintain the external incidents of separateness.
 
 
 115
 Fifth, even if Weston's entities failed to comply with all of the formalities that they should have and even if Weston did freely transfer funds among the entities, the claimants here have not shown how their injury was connected with the entities' commingling or lack of formalities or how the claimants relied on the entities' separateness or the lack thereof. As the Utah corporate-veil test demonstrates, it is not enough to declare that two corporations or a corporation and its prime shareholder are not really separate. The claimant must show that recognition of the corporate form would "sanction a fraud, promote injustice, or [produce] an inequitable result." Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979).
 
 
 116
 But the "injustice" or "inequity" on which a piercing claim is based cannot stem from the mere existence of limited liability, which is a legitimate characteristic of the corporate form. Rather, the "injustice" or "inequity" to the claimant must be connected with the lack of separateness between the corporation and its controlling stockholder and the failure to observe corporate formalities. Here, the defendants' losses generally had little to do with the Weston entities' lack of corporate formalities. Although there was comingling of funds among the various Weston entities, all the parties knew that they were separate entities and Weston maintained the corporate formalities of each entity separate from the others. The acts of comingling may have been acts of conversion, breach of fiduciary duty or the like, but there was no misrepresentation of the corporate stature of the entities with whom the various investors dealt. For example, the evidence showed that Cascade misappropriated roughly $300,000 from the Joint Venture and that Rex Montis misappropriated about $10,000. See Part I.C above. Cascade plainly is obligated to return the $300,000 and Rex Montis must return the $10,000. But there is no reason to make Rex Montis responsible for repaying the $300,000 taken by Cascade. That result would be a windfall to the Joint Venture.[20]
 
 
 117
 We note that to the extent Weston or Cascade have an ownership interest in the entities, that interest may be susceptible to attachment by creditors. Thus, Cascade's 50 percent interest in Telegraph Limited may be subject to levy. Likewise, Weston's 22 percent interest in his trust, Gnolaum Unitrust, may be reachable by his creditors.
 
 3. Conclusion on piercing issue
 
 118
 We hold that Rex Montis, Interphase, Telegraph Limited, and Gnolaum Unitrust are not jointly and severally liable for defendants' damage award against Weston and Cascade. We affirm the district court's holding that Rex Montis is liable in its own right for having taken $10,500 from the Joint Venture. Likewise, we agree that Interphase is liable in its own right for having taken $111,990.29 ($30,681.89 plus $81,308.40) from the Joint Venture. On remand, the district should determine whether Rex Montis, Interphase, Telegraph Limited, and Gnolaum Unitrust are directly liable for breaching any other duties owed by them (provided the defendants properly raised those grounds below).
 
 
 119
 E. Associate Defendants' Liability On Promissory Notes (Weston Entities' Issue No. 5)
 
 
 120
 The district court held that although the Associate Defendants could not recover any of the cash that they had paid to the Joint Venture for royalty payments ($30,000 per 1/35th unit in both 1980 and 1981), they were relieved of any obligation to pay the promissory notes that they had given to the Joint Venture as royalty payments ($44,285 per 1/35th unit in both 1980 and 1981). We affirm that holding. The promissory notes given by the Associate Defendants were clearly given in exchange for promises that were materially breached. Those uncured, material breaches discharged the Associate Defendant's duty to render further performance, including payments not yet made on their promissory notes. Restatement (Second) Contracts Secs. 232 (Illustration 4), 237, 242 (1981).[21]
 
 
 121
 F. Associate Defendants' Liability For Development Loan (Weston Entities' Issue No. 6)
 
 
 122
 The district court held that the Associate Defendants were relieved of all liability for repayment of the $800,000 development loan which the Joint Venture had made to the Associates from the proceeds of the working-interest sale. For the same reasons that we affirm the ruling discharging the Associate Defendant's liability on the promissory notes in Part 1.E, we similarly affirm the ruling of the district court discharging the Associate Defendant's from any liability to repay the $800,000 development loan.
 
 
 123
 G. Attorneys' Fees (Weston Entities' Issue No. 7)
 
 
 124
 The district court awarded the Associate Defendants attorneys' fees for Cascade's bad faith in suing the Associates for additional cash capital contributions. Utah law expressly permits an award of attorneys' fees for actions not brought in good faith. Utah Code Ann. Sec. 78-27-56 (allowing award of "reasonable attorney's fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith").
 
 
 125
 We do not think that the district court abused its discretion in awarding attorneys' fees here, and consequently, we affirm that ruling.
 
 
 126
 H. Alleged Fiduciary Breach By Associate Defendants And Gold Technics Defendants (Weston Entities' Issue No. 8)
 
 
 127
 The district court rejected Gnolaum Unitrust's claims that certain of the Associate Defendants and the Gold Technics Defendants were liable to Gnolaum Unitrust for breach of fiduciary duty, breach of contract, breach of partnership duty, fraud, and tortious interference with business relationships. See Gnolaum Br. at 6. The district court held basically that the Associate Defendants had no duty to pay assessments under the Operating Agreement (see Part I.A above) and that the defendants had not engaged in any tortious conduct toward Gnolaum Unitrust or the other Weston affiliates. (Findings 95, 114.)
 
 
 128
 After reviewing the record, we do not believe that the district court's findings on this issue are clearly erroneous.
 
 II. ISSUES RAISED BY ASSOCIATE DEFENDANTS
 
 129
 A. Whether Working Interests Were Securities (Associate Defendants' Issue No. 1)
 
 
 130
 The Associate Defendants contend that the 35 working interests sold by the Joint Venture were securities under the statutory definitions in Section 2(1) of the Securities Act of 1933 (15 U.S.C. Sec. 77b(1)), Section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. Sec. 78c(a)(10)), and Section 25019 of the California Corporations Code.[22] We agree.
 
 
 131
 The district court's April 1985 ruling on this issue predated the Supreme Court's decision in Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). In Landreth, the Supreme Court held that when an instrument falls "plainly within the statutory definition" of a security, "[t]here is no need ... to look beyond the characteristics of the instrument to determine whether the [federal securities] Acts apply." Id. at 690, 105 S.Ct. at 2304.[23]
 
 
 132
 Each of the 35 units sold here consisted of "an undivided one-thirty-fifth ( 1/35) working interest in the Mining Claims." (Exh. 1, Attachment C, Working Interest Agreement at 1.) As such, each of the 35 working interests plainly constituted a "fractional undivided interest in ... mineral rights" under the Securities Act of 1933, a "certificate of interest or participation in [a] ... mineral royalty or lease" under the Securities Exchange Act of 1934, and a "certificate of interest or participation in [a] ... mining title or lease" under the California securities statute. Therefore, because there is no ambiguity in the statutory definitions involved here and because there was no evidence that the 35 working interests were anything other than what they purported to be, we conclude that the working interests are "securities" under the state and federal statutes. See Penturelli v. Spector, Cohen, Gadon & Rosen, P.C., 779 F.2d 160, 164-67 (3d Cir.1985) (under Landreth analysis, "fractional undivided working interests" in coal mine were securities).[24]
 
 
 133
 Consequently, we reverse the District Court's ruling that the Associate Defendants' interests were not securities and we remand the case to the district court for resolution of the Associate Defendants' securities claims.[25]
 
 
 134
 B. Fraud or Negligent Misrepresentation (Associate Defendants' Issue No. 2)
 
 
 135
 The district court held that there was no actionable fraud or negligent misrepresentation in the initial offering and sale of working interests in the mine. The Associate Defendants point to various facts which they assert support a finding of fraud or negligent misrepresentation by Weston. The district court concluded that those facts did not support a finding of liability because the alleged misstatements and nondisclosures were not material or they were not made with the requisite scienter or they were not relied upon by the Associate Defendants. See Findings 79-97.
 
 
 136
 The Associate Defendants have not demonstrated to us that the district court's findings concerning Weston's alleged fraud and negligent misrepresentations are clearly erroneous. Thus, we affirm the district court's ruling on those issues.
 
 
 137
 C. Recovery For Adverse Tax Consequences (Associate Defendants' Issue 3)
 
 
 138
 The Associate Defendants contend that the district court erred in failing to allow them recovery for adverse tax consequences allegedly caused by the misconduct of Cascade and Weston. In response, Cascade asserts that the Associate Defendants "have failed to show that any adverse tax rulings they received were a direct result of either fraud or breach of fiduciary duty." (Cascade Reply Br. at 14.) The district court made no express findings concerning the adverse tax consequences allegedly suffered by the Associate Defendants.[26]
 
 
 139
 From the record and rulings of the district court, we are unable to determine the basis for the district court's denial of damages for adverse tax consequences. We can theorize at least three possible grounds for the district court's decision: (1) the district court may have held that damages for adverse tax consequences are not allowable as a matter of law; (2) the district court may have concluded that the Associate Defendants had not proved the elements of their claim for those damages, such as the existence of the damages or a causal connection between the damages and the wrongdoing of Cascade and Weston; or (3) the district court may have concluded that the Associate Defendants did not properly raise and preserve the issue in the pretrial order or at trial.
 
 
 140
 On remand, the district court should make express findings concerning its reason for denying the Associate Defendants' claim for damages stemming from adverse tax consequences. We note that at least one circuit court has indicated that tax consequences may potentially be considered in computing damages in certain circumstances. See Sharp v. Coopers & Lybrand, 649 F.2d 175, 189-91 (3d Cir.1981) (investors in tax shelter could recover damages for fraud including damages associated with fraudulently promised tax benefits), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982), overruled on other grounds, In re Data Access Systems Securities Litigation, 843 F.2d 1537, 1550 (3d Cir.) (en banc) (implicitly overruling Sharp on statute-of-limitations issue), cert. denied, --- U.S. ----, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988); but cf. Randall v. Loftsgaarden, 478 U.S. 647, 666-67, 106 S.Ct. 3143, 3154-55, 92 L.Ed.2d 525 (1986).
 
 
 141
 III. ISSUES RAISED BY GOLD TECHNICS DEFENDANTS
 
 
 142
 A. Sale Of 30 Percent Interest To Rex Montis (Gold Technics Defendants' Issue No. 1)
 
 
 143
 The Gold Technics Defendants contend that the district court erred in refusing to award them recision in connection with Gold Technics' September 1980 sale of a 30 percent interest in the mine lease to Rex Montis in exchange for 480,000 shares of Rex Montis stock. Under the Purchase Agreement, Rex Montis expressly agreed to convey 480,000 Rex Montis shares to Gold Technics in exchange for a 30 percent interest in the mine lease and Rex Montis' appointment as general partner of Gold Technics:
 
 
 144
 Rex Montis agrees, subject to the warranties, conditions and terms of this Agreement as made by Technics and Technics Limited Partners, to convey to Gold Technics Ltd., as full consideration for the above referenced purchase, 480,000 shares of its common capital stock....
 
 
 145
 (Exh. 308, Purchase Agreement at 2.) Rex Montis further warranted that the "[s]hares of common stock of Rex Montis deliverable pursuant hereto, when issued and delivered, will be validly issued and outstanding shares of the common stock of Rex Montis Silver Company." (Id. at 3.) In addition, Rex Montis agreed that "[i]n the event the transaction contemplated by this Agreement or any part thereof is subject to the review or approval of any governmental agency or department having jurisdiction in the state of California, or otherwise, Rex Montis agrees to bear any and all costs required by such review or approval." (Id. at 6.)
 
 
 146
 Rex Montis never conveyed or delivered the 480,000 Rex Montis shares to Gold Technics. It did not do so in part because the shares were unregistered and Rex Montis could not obtain the California Corporations Commission's approval of the transaction as required by California law. See Calif.Corp.Code Secs. 25110, 25113.
 
 
 147
 Although, this might ordinarily provide grounds for recision, Restatement (Second Contracts Secs. 372-73 (1981), the district court refused to order recision here because it concluded that Gold Technics was barred by doctrines of waiver, unclean hands, and the failure adequately to tender back to Rex Montis the consideration and benefits it had received. Gold Technics failure adequately to exercise its recision rights under the California Corporation Code, which controlled the transfer of Rex Montis' stock. Calif.Corp.Code Secs. 25110, 25113, 25507. The affirmative defenses found by the district court bar a common law right to recision. We have reviewed the record and can not say that the district court's finding of fact with regard to these affirmative defenses was clearly erroneous. Accordingly, we affirm the holding refusing to grant recision to Gold Technics.[27]
 
 
 148
 B. Conversion Of 38,000 Shares Of Rex Montis Stock (Gold Technics Defendants' Issue No. 2)
 
 
 149
 The Gold Technics Defendants contend that the district court improperly failed to award it $18,000 in damages against Cascade, Rex Montis and Weston for their conversion of 38,000 shares of Rex Montis stock belonging in equity to Gold Technics. The district court did specifically find such a conversion, Accounting Findings 28, and it did award damages of $18,620 against Rex Montis and for the benefit of Gold Technics, Ltd., apparently as a result of this conversion. Accounting Findings 32. Although the damages were not specifically mentioned again in the district court's conclusions of law, Accounting Conclusions of Law 6, we think it is clear that Gold Technics was awarded such damages. We remand so that the district court may also enter judgment against Cascade and Weston for this amount.
 
 
 150
 C. Damages For Termination Of Joint Venture (Gold Technics Defendants Issue No. 3)
 
 
 151
 The Gold Technics Defendants contend that the district court erred in awarding them only $5,000 for the termination of the Joint Venture. The Gold Technics Defendants do not object to the dissolution of the Joint Venture, but argue that the district court improperly gave "all right, title and interest to equipment, and other [Joint Venture] assets to Weston, the person responsible for the bad acts and collapse" of the Joint Venture. (Gold Technics Br. at 17.)
 
 
 152
 It is unclear whether the district court, in awarding $5,000, took into account the Gold Technics Defendants' interest in the mine lease and other mine assets. Accounting Findings 27. Although it is possible that the district court did take all of these matters into account when it ordered no further accounting between the parties, we can not be sure that it did so. Accounting Finding 33.
 
 
 153
 Therefore, we vacate the district court's award of $5,000 in "nominal damages" and remand for a complete winding up of the Joint Venture. As part of the winding up on remand, the district court should allocate the venture's assets (which may include the mine lease or its proceeds) and the venture's liabilities in accordance with the Joint Venture Agreement and general partnership law. To the extent that the venturers are indebted to one another consistent with this opinion, those debts should be accounted for as part of the winding up.
 
 
 154
 D. Interest Of R.E. Donahey (Gold Technics Defendants' Issue No. 4)
 
 
 155
 The Gold Technics Defendants contend that in dissolving the Gold Technics limited partnership and in allocating the money judgment among the Gold Technics Defendants, the court erred in failing to give any recovery to one of Gold Technics' limited partners, R.E. Donahey.
 
 
 156
 The district court made no express findings as to why it denied recovery to Donahey. See Jan. 22, 1986 Order Amending Judgment. The record shows that (1) Donahey was a full-share limited partner of Gold Technics (Exh. 305, Partnership Agreement); (2) Donahey signed the September 1980 Purchase Agreement with Rex Montis (Exh. 308); (3) Donahey signed a June 14, 1982 letter requesting rescission of the Purchase Agreement (Exh. 375); and (4) Donahey otherwise has participated as a party in the prosecution and defense of this litigation from its inception. On remand, the district court either should allow Donahey to recover on the same terms as the other limited partners of Gold Technics, or else should make findings explaining why Donahey is not so entitled.
 
 IV. CONCLUSION
 
 157
 1. The district court's finding that the Associate Defendants were not obligated to pay cash assessments under the Joint Operating Agreement is AFFIRMED. The district court's judgment against Cascade and Weston and in favor of certain of the Associate Defendants for $70,449.68 in assessments wrongfully collected from them is AFFIRMED.
 
 
 158
 2. The district court's finding that Cascade and Weston breached their fiduciary duties owed to the Associate Defendants is AFFIRMED.
 
 
 159
 3. The district court's finding that Cascade and Weston misappropriated $629,474.63 from the Joint Venture is VACATED and REMANDED with instructions that the district court reduce the amount by $165,000 to $464,474.63. Rex Montis is directly liable for misappropriating $10,500 of that amount. Interphase is directly liable for misappropriating $111,990.29 ($30,681.89 plus $81,308.40) of that amount. Cascade and Weston are liable for misappropriating the full amount, $464,474.63.
 
 
 160
 4. The district court's finding that Rex Montis, Interphase, Telegraph Limited, and Gnolaum Unitrust are alter egos of Weston and Cascade is REVERSED.
 
 
 161
 5. The district court's ruling that the Associate Defendants should be relieved from all liability for unpaid royalty payments and for any unpaid payments on the promissory notes is AFFIRMED.
 
 
 162
 6. The district court's ruling that the Associate Defendants should be relieved from all liability for their share of the $800,000 development loan is AFFIRMED.
 
 
 163
 7. The district court's judgment against Cascade and Weston for $265,000 in attorneys' fees is AFFIRMED.
 
 
 164
 8. The district court's ruling that the Associate Defendants and the Gold Technics Defendants did not breach any fiduciary duties owed to Gnolaum Unitrust or the other Weston entities and did not engage in other tortious conduct against Gnolaum Unitrust or the other Weston entities is AFFIRMED.
 
 
 165
 9. The district court's ruling that the 35 working interests in the mine lease were not securities under federal and California securities laws is REVERSED and REMANDED for further proceedings. The district court should resolve the Associate Defendants' securities claims on remand.
 
 
 166
 10. The district court's ruling that Weston and his entities were not liable for common law fraud or negligent misrepresentation in the initial offering of the 35 working interests is AFFIRMED.
 
 
 167
 11. The district court's ruling that the Associate Defendants are not entitled to recover for adverse tax consequences stemming from the misconduct of Weston and his entities is VACATED and REMANDED for clarification.
 
 
 168
 12. The district court's ruling that the Gold Technics Defendants are not entitled to rescission of the September 1980 Purchase Agreement is AFFIRMED.
 
 
 169
 13. The district court's failure to award damages in its conclusions of law to Gold Technics as a result of the conversion by Cascade, Rex Montis, and Weston of 38,000 shares of Rex Montis stock is REMANDED for clarification.
 
 
 170
 14. The district court's award of $5,000 in nominal damages to Gold Technics for the termination of the Joint Venture is VACATED and the case is REMANDED for a complete winding up of the affairs of the Joint Venture or for clarification.
 
 
 171
 15. The district court's ruling that R.E. Donahey is not entitled to participate in the recovery of the other Gold Technics Defendants is VACATED and REMANDED for clarification.
 
 
 172
 The parties make numerous arguments in their briefs that we have not specifically discussed in this opinion. We have tried to limit our discussion to the major contentions of the parties, lest this opinion become even longer than it is now. Nonetheless, in reaching our disposition, we have considered all of the parties' arguments, including those that we have not specifically discussed in this opinion and we decline to grant any other requested relief on appeal other than as indicated herein.
 
 
 173
 The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED.[28]
 
 
 
 [1]
 The Associate Defendants are Jeffery G. Banks, Kenneth Caldwell, Coastal Computer Investments, Elmer J. Davis, David G. Henry, Roger A. Mann, Mann Caldwell Partnership, Robert A. Nickerson, Peter P. Samarin, Patricia Stoltenberg, Herbert W. Stoltenberg, Edwin Stoltenberg, Delford Ashley, George Slater, Patricia Slater, Robert Doub, Sam Hambarian, Alyce Hambarian, and Lionel Ascher
 
 
 [2]
 The Gold Technics Defendants are Samuel Harmatz, Bernard Hodowski, A.C. Nejedly, Chris Waugh, H.E. Moses, R.E. Donahey, Grace V. Duncan, and Elliot Weinberg and Harmatz & Hodowski
 
 
 [3]
 The non-party investors appearing as amici curiae are Harold Masunaga, Marion Harada, Ukio Ayabe, Lyle Muller, Charles Higashi, Joseph Green, and William Ohara
 
 
 [4]
 When we refer to the "Weston entities," we mean Cascade, Telegraph Limited, Rex Montis, Gnolaum Unitrust, Interphase, and the Telegraph Mine Joint Venture. We do not include Gold Technics as a Weston entity because, although Rex Montis is Gold Technics' general partner, essentially all of Gold Technics' limited partners are adverse to Weston in this litigation
 
 
 [5]
 The transaction's underlying documents refer to this $74,285 payment as an "annual minimum royalty." The Associates paid the annual royalty to the Joint Venture, which held an exclusive sublease on the mine, for the right to mine minerals on the property
 
 
 [6]
 In the first and second years, the $74,285-per-unit minimum royalty payment was to be paid with $30,000 in cash and a $44,285 promissory note. For the third year and subsequent years, the Associates were allowed to make the entire $74,285 payment with a promissory note in that amount. In other words, the Associates were required to make $30,000 cash payments only in the first and second years
 
 
 [7]
 The proceeds of the $800,000 development loan were deposited into an Associates' bank account for which Cascade, as manager of the project, had signature authority
 
 
 [8]
 The memorandum forecast that in 1981, 13,200 tons of ore would be mined and milled, resulting in the production of over $3 million worth of gold and silver ($86,034 per 1/35th unit). The memorandum further projected that in 1982, 52,800 tons of ore would be mined and milled, resulting in the production of over $12 million worth of gold and silver ($344,135 per 1/35th unit). Those projections were based on a gold price of $525 per ounce and a silver price of $15 per ounce. The same level of production and income predicted for 1982 was forecast for later years through 1991
 
 
 [9]
 There was some confusion below over whether the defendants' claims against Weston and the other Weston entities besides Cascade should be denominated "third-party claims" or "counterclaims" or "cross-claims." The district court noted that defendants' claims technically were not third-party claims because "no indemnity or judgment over was thereby sought pursuant to Rule 14, Fed.R.Civ.P." (Findings 17 n. 1.) Rule 14 allows a "defending party, as a third-party plaintiff," to sue a "person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." The trouble is that in a technical sense, defendants' claims also are not counterclaims or cross-claims because Weston and the other Weston entities were not yet parties to the action at the time defendants' claims were filed. Rule 13, Fed.R.Civ.P., provides that a "counterclaim" is a claim "against any opposing party" and that a "cross-claim" is a "claim by one party against a co-party." In substance, the defendants' claims are in the nature of separate lawsuits that have been consolidated with Cascade's action. There is no question that all of the claims asserted below were properly before the district court. The issue is what to call them. We think that because defendants effectively brought new parties into the litigation for the purpose of asserting new claims against them, the defendants' claims against Weston and the other Weston entities are more like third-party claims than counterclaims or cross-claims. Consequently, we will label them so
 
 
 [10]
 Just as the Gold Technics Defendants alleged that Weston and Cascade had misappropriated large sums of money from the Joint Venture, the Associate Defendants alleged that Weston and Cascade had misappropriated or mismanaged money belonging to the Associates. The district court did not address the Associate Defendants' accounting claims because (1) the only money allegedly squandered or taken from the Associates was part of the initial $800,000 amount that the Joint Venture had loaned to the Associates, and (2) the district court had nullified the Associate Defendants' obligation to repay that loan, thereby mooting the issue
 
 
 [11]
 Cascade's accounting was suspicious from the start. Although the district court ordered Cascade to provide a full accounting prepared according to Generally Accepted Accounting Principles (R. 300 at 2; Accounting Tr. 168.), Cascade's accounting was not prepared by an accountant but by Weston himself. Although Weston consulted an accountant while preparing the accounting and enlisted an accountant to review Cascade's bookkeeping procedures generally, the accounting was neither audited nor certified by an accountant. Weston alone testified concerning the accuracy of the accounting and its compliance with Generally Accepted Accounting Principles. Weston admitted on cross-examination that his only formal training in accounting was a "class in Accounting 101 ... at Brigham Young University." (Accounting Tr. 171.) At the accounting trial, Weston was asked whether his one college course qualified him to render an opinion based upon Generally Accepted Accounting Principles:
 Q. Do you feel yourself qualified to render an opinion based upon generally accepted accounting principles?
 A. As it applies to these records, yes, I do.
 (Accounting Tr. 171-72.)
 
 
 [12]
 The amount shown on the balance sheet was $78,417.89. The district court apparently found that $47,736.00 ($78,417.89 less $30,681.89) was a carry forward from 1980 and thus was not attributable to the Joint Venture. See Accounting Tr. 90-91
 
 
 [13]
 In its interrogatories to Cascade about the accounting, Gold Technics specifically asked Cascade to "[s]tate the reason for each of these expenditures by Cascade to Interphase 'On Account.' " Cascade chose not to provide a detailed response. Instead, Cascade stated that the expenditures were "[i]n payment for contract services" and referred to two ledger accounts. (R. 322 at 82-83.) Weston admitted at trial that because Interphase's funds were commingled with funds received from Cascade and because invoices often were not created until after the fact (if at all), there was no way to determine from the ledgers what the funds actually were spent for. (Accounting Tr. 108-09.)
 
 
 [14]
 Cascade's capital-distribution explanation makes little sense on its face. First, Cascade and Interphase had no capital interest in the Joint Venture and thus could have no interest in any capital distributions. Telegraph Limited was the 60 percent owner of the Joint Venture, yet the transfers went not to Telegraph Limited but to Cascade and Interphase. Second, even if Cascade and Interphase (through Telegraph Limited) were entitled to a capital distribution, Cascade's numbers do not add up. If Gold Technics as 10 percent owner received $40,949 as a capital distribution, then Telegraph Limited as 60 percent owner would be entitled to six times that amount, $245,694, and not $270,200 as asserted by Cascade, and Rex Montis as 30 percent owner would be entitled to three times Gold Technics' distribution, $122,847, and not $91,807.55 as asserted by Cascade
 
 
 [15]
 On appeal, Rex Montis argues that if the $28,723.16 was a loan to Gold Technics, then Cascade and Rex Montis were entitled to an offset in that amount. (Rex Montis Br. at 20.) We agree that Gold Technics is obligated to repay all outstanding debts owed to the other parties in this action, subject to any defenses that Gold Technics might have. The district court should address that issue on remand
 
 
 [16]
 At the time of trial, Cascade was a publicly traded company having approximately 1200 shareholders. (Accounting Tr. 362.)
 
 
 [17]
 A "reverse piercing" claim is when ("a corporate insider, or someone claiming through him, attempt[s] to pierce the corporate veil from within so that the corporate entity and the individual will be considered one and the same.") Fletcher Cyc. Corp. Sec. 41.70 at 458 (1983). Utah has addressed that theory only once, and it characterized that theory as "little recognized." Messick v. PHD Trucking Service, Inc., 678 P.2d 791, 793 (Utah 1984). The application here is a variant because it is not an insider who seeks to meld the stockholder and the corporation into one; rather it is an outsider who is asserting that theory
 
 
 [18]
 This case raises the issue of whether the standards for piercing a corporate veil should be determined by the law of the corporation's state of incorporation or by the law of the state whose substantive law applies to the case generally. Compare 17 Fletcher Cyc. Corp. Sec. 8326 at 120 (1987) ("[T]he liability of a stockholder for corporate debts and the extent and character of that liability are to be determined by the law of the state under the laws of which the corporation was created....") with 13A Fletcher Cyc. Corp. Sec. 6228 at 90 (1984) ("Where a corporation is formed in one state for the purpose of doing business in another state, its stockholders will be held liable in accordance with the laws of the latter state in so far as business transacted there is concerned"). See also, e.g., Jefferson Pilot Broadcasting Co. v. Hilary & Hogan, Inc., 617 F.2d 133, 135 (5th Cir.1980) (applying law of state of incorporation to corporate veil issue); RRX Industries v. Lab-Con, Inc., 772 F.2d 543, 545-46 (9th Cir.1985) (applying law of state where contract was breached to corporate veil issue even though corporations were incorporated in other states); Restatement (Second) Conflicts Sec. 307 at 328 (1971) ("The local law of the state of incorporation will be applied to the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.") (emphasis added); id. Sec. 297, comment c at 291. However, because of the peculiar circumstances of this case, we need not resolve the general issue of what law applies to corporate veil questions. The four entities whose veils were pierced here--Rex Montis, Interphase, Telegraph Limited, and Gnolaum Unitrust--all are Utah entities. Cascade is a Nevada corporation but, as noted above, its corporate veil has not been pierced. Much of the wrongdoing in this case occurred at Cascade's headquarters in Utah. The only other state having substantial contacts with this litigation is California, where the mine is located and where many of the defendants reside. However, none of the parties specifically argues that California law applies to the corporate veil issue. Moreover, California's standard for piercing the corporate veil does not appear to be materially different from Utah's. Compare Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979) with Automotriz Del Golfo De California v. Resnick, 47 Cal.2d 792, 306 P.2d 1, 3 (1957) and Institute of Veterinary Pathology, Inc. v. California Health Labs., Inc., 116 Cal.App.3d 111, 119, 172 Cal.Rptr. 74, 78 (1981). Therefore, we conclude that the district court properly applied Utah law to the corporate veil issue
 
 
 [19]
 See generally 1 Fletcher Cyc. Corp. Sec. 41.85 at 460 (1983) ("Courts have generally been more likely to disregard the corporate entity in tort cases than in cases of contract...."); F. Easterbrook & D. Fischel, Limited Liability and the Corporation, 52 U.Chi.L.Rev. 89, 112 (1985) (discussing economic justification for treating tort and contract cases differently for corporate veil purposes); Edwards v. Monogram Indus., 730 F.2d 977, 980-84 (5th Cir.1984) (en banc) (discussing distinction between tort and contract cases for corporate veil purposes)
 
 
 [20]
 Although Rex Montis is not responsible for the money that Cascade took from the Joint Venture, Cascade is responsible for the approximately $10,000 that Rex Montis took. The reason is that Cascade, in its capacity as manager of the Joint Venture, breached its fiduciary and contractual duty owed to the Joint Venture by wrongly authorizing the $10,000 transfer to Rex Montis
 
 
 [21]
 Additionally, the record adequately supports the finding of the district court that, to the extent equitable relief was sought, that Cascade and the joint venture were barred by the doctrine of unclean hands from receiving relief pertaining to the collection of the royalty notes or developments notes. (Findings 121)
 
 
 [22]
 In 1980, when the working interests were sold, Section 2(1) of the Securities Act provided in pertinent part:
 The term "security" means any note, stock, treasury stock, bond, debenture, ... investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security"....
 15 U.S.C. Sec. 77b(1) (emphasis added). In 1980, Section 3(a)(10) of the Securities Exchange Act provided in pertinent part:
 The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate ... investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"....
 15 U.S.C. Sec. 78c(a)(10) (emphasis added). Calif.Corp.Code Sec. Section 25019 provides in pertinent part:
 "Security" means any ... certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease....
 
 
 [23]
 Although the Court in Landreth dealt only with the definition of the term "stock," the phrase "fractional undivided interest in oil, gas, or other mineral rights" and the phrase "certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease" appear equally susceptible to plain meaning
 
 
 [24]
 Accord Adena Exploration, Inc. v. Sylvan, 860 F.2d 1242, 1249-50 (5th Cir.1988) (oil and gas working interest was security); Cf. U.S. Industries v. Touche Ross & Co., 854 F.2d 1223, 1233 (10th Cir.1988) ("Because it is undisputed that the shares purchased by HI in the present case bear all the indicia of stock, we conclude that they are securities within the meaning of the federal securities laws"); Because we believe that the standards of Landreth are met here, we need not reach the issue of whether the 35 working interests also are securities because they are "investment contracts" under Securities and Exchange Comm. v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)
 
 
 [25]
 We express no opinion concerning the merits of those securities claims or the various defenses to them raised by Weston and his entities. Nor do we express an opinion as to whether the district court's findings concerning the Associate Defendants' fraud and negligent misrepresentation claims (see Part II.B below) affect the securities claims. We note that the clear and convincing standard of proof applicable to common law fraud claims (See Finding 85) is higher than the standard for claims under Sec. 10(b) of the Securities Exchange Act. Herman & MacLean v. Huddleston, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983) (adopting preponderance of the evidence standard)
 
 
 [26]
 But see Findings 114 ("Except by the foregoing findings otherwise indicated, the issues of fact raised in the pleadings or reserved in the pretrial order are determined against the party or parties having the burden of proof with respect to them, the Court hereby finding that the evidence in support of them is insufficient.")
 
 
 [27]
 Although the California Corporation Code may prevent the legal transfer of the Rex Montis stock to Gold Technics, we see no impediment to the relief ordered by the district court that Rex Montis hold its stock in trust for Gold Technics
 
 
 [28]
 We note that this is a complicated case and the underlying situation may have changed since trial. We do not foreclose the district court from filling in gaps and doing other things consistent with this opinion in order to achieve a just resolution of the case. We also want to compliment the district court for its careful analysis and review of the very complex facts underlying the many disputes between the parties