**F I L E D**

PUBLISH

**JUL 21 2003**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

W. DAVID WESTON; REX MONTIS
SILVER COMPANY,

      Cross-Counterclaimants -
      Cross-Defendants -
      Appellants,

v.

SAMUEL HARMATZ; H.E. MOSES;
BERNARD HODOWSKI; CHRIS
WAUGH; A.C. NEJEDLY; ESTATE
OF R.E. DONAHEY; GRACE V.
DUNCAN; ELLIOTT WEINBERG,

      Defendants - Appellees.

No. 01-4232

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:82-CV-1223-J)**

---

Delano S. Findlay (W. David Weston, pro se, with him on the brief), Salt Lake
City, Utah, for Cross-Counterclaimants-Cross-Defendants-Appellants.

Eric C. Olson, Kirton & McConkie, Salt Lake City, Utah, for Defendants-
Appellees.

---

Before **BRISCOE** , **McKAY** , and **McCONNELL** , Circuit Judges.

**McCONNELL** , Circuit Judge.

---

Like miners brawling over tiny flecks of gold from the remains of a once-promising strike, Appellants come to this Court for the third time, seeking to extract a few pennies more from their investment in a gold mine venture that failed almost twenty years ago.  Resurrecting legal arguments rejected at earlier stages of this litigation, contradicting their own contemporaneous valuations of the assets at issue, and presenting a view of the record with as much resemblance to reality as an ancient prospector's memories of what might have been, Appellants ask this Court to shield them from the consequences of their own folly (and worse).  We compliment the district court for extracting a fair result from the evidentiary detritus put forward by these appellants, and now bring the legal saga of the Telegraph Gold Mine to a close.  The judgment of the district court is AFFIRMED.

## BACKGROUND

Our first opinion involving this case,     *Cascade Energy & Metals Corp. v. Banks* , 896 F.2d 1557 (10th Cir. 1990) ("     *Cascade I* "), recounts the convoluted history of the mining venture and resulting litigation, and also provides a helpful diagram illustrating the web of inter-related business associations involved in the mine.  We provide here only an abbreviated history of the particular facts related

to the current appeal.

Cascade Energy and Metals Corporation ("Cascade"), a Nevada corporation, acquired the Telegraph Gold Mine near California's Death Valley in 1974. Appellant W. David Weston was Cascade's president and owned or controlled more than 50% of its stock. Cascade then leased the mine to a Weston-controlled limited partnership, Telegraph Mine Limited ("Telegraph Limited"), whose general partner was Cascade. In 1979, Telegraph Limited sold 40% of its interest in the lease to a California limited partnership called Gold Technics, Ltd. ("Gold Technics"). The appellees in this case are limited partners in Gold Technics who collectively owned a 90% interest in the Gold Technics partnership.

Telegraph Limited and Gold Technics formed the Telegraph Mine Joint Venture (the "Joint Venture") to operate the mine. The Joint Venture Agreement provided that Cascade would manage the Joint Venture. In 1980, Gold Technics sold 75% of its share of the Joint Venture to Appellant Rex Montis Silver Company ("Rex Montis"), a Utah corporation controlled by Weston. Rex Montis became the general partner of Gold Technics as part of the deal. The transaction required Rex Montis to convey 480,000 shares of its stock to Gold Technics, but the shares were never delivered. After this transaction, the ownership structure of the Joint Venture was as follows: 60% owned by Telegraph Limited, a Weston controlled entity, 30% owned by Rex Montis, another Weston entity, and 10%

3

owned by Gold Technics, a limited partnership controlled by Weston entity Rex Montis but 90% owned by the appellees. In essence, the appellees had a 9% interest in and no control of a joint venture that was completely controlled and majority owned by Weston and his affiliated entities.

Cascade then raised additional capital for the Joint Venture by selling working interests in the mine to various individual and institutional investors known as the "Associates," among whom were some of the Gold Technics limited partners. [1] The transaction required the Associates to hire Cascade to operate the mine. According to the offering documents, Weston anticipated that the Joint Venture's initial capitalization would be sufficient to get the project going, and that subsequent operations would be self-sustaining based on mining revenues. Cascade commenced operations at the mine, but Weston soon realized that the initial capitalization was not enough even to sink a shaft. Weston persuaded the Associates that Cascade could generate profits more quickly and with fewer start-up costs by surface mining. However, more than a year's worth of moiling for gold succeeded only in draining the venture's coffers. Throughout this period, Weston repeatedly dunned the Associates for additional payments he claimed they

---

[1]Throughout this opinion, the term "Gold Technics limited partners" refers only to the appellees and not to Weston, who (confusingly) was also a Gold Technics limited partner and owned the 10% of Gold Technics not owned by the appellees.

were required to make, insisting all the while that only a little more time and a little more money stood between them and a profitable gold mine. Some of the Associates refused to pay Weston's "assessments," on the ground that the original agreement did not obligate them to make additional payments.

In December, 1982, Cascade filed suit in district court against the non-paying Associates. The Associates, together with the Gold Technics limited partners who were not Associates, counterclaimed, alleging among other things that Weston, through his affiliated entities, had misappropriated the Joint Venture's assets by mingling the funds among his various entities and using them for his own separate purposes. The district court found, *inter alia*, that (1) Weston and his entities had misappropriated more than $600,000 from the Joint Venture and converted its funds for their own use, (2) Weston and Cascade were liable for the Associates' attorneys' fees because the original suit to assess them was meritless and brought in bad faith, (3) the Joint Venture and Gold Technics should be terminated and dissolved, and (4) the Gold Technics limited partners were entitled to damages for the wrongful termination of the Joint Venture.

This Court generally upheld these findings on appeal, except that it reduced the amount of Weston's misappropriation to $464,474.63. *Cascade I*, 896 F.2d at 1583-84. The Court then remanded for a "complete winding up of the Joint Venture" because it could not determine "whether the district court . . . took into

5

account the Gold Technics [limited partners'] interest in the mine lease and other mine assets." *Id.* at 1583. On remand, the district court was instructed to "allocate the venture's assets (which may include the mine lease or its proceeds) and the venture's liabilities in accordance with the Joint Venture Agreement and general partnership law." *Id.*

Following a second district court trial on remand, Weston and Cascade appealed again to this Court, challenging the district court's valuation of the Joint Venture's assets and raising several other issues concerning the district court's winding up of the Joint Venture. In the second Tenth Circuit decision, *Cascade Energy & Metals Corp. v. Banks*, 85 F.3d 640, 1996 WL 15549 (10th Cir. 1996) (unpublished) (" *Cascade II* "), the Court upheld the district court's valuation of the Joint Venture's principal asset, the prime lease on the Telegraph Mine, at $1,100,000. *Cascade II* also reversed the district court's finding that the Joint Venture's "Ore Milling Receivable" (valued at $239,034) was not a valid collectible asset of the Joint Venture. 1996 WL 15549 at **1. The Court in *Cascade II* then remanded the case for a proper winding up of the Joint Venture as required by *Cascade I* , taking into account the adjudicated value of the Joint Venture's principal assets. *Id.* at **6.

The district court on remand held yet another trial in April, 2000, and entered Amended Findings of Fact and Conclusions of Law on October 31, 2001

6

("Amended Findings"). The Amended Findings established June 17, 1985 as the dissolution date of the Joint Venture. On that date, Weston, without notice to the Gold Technics limited partners, had caused the Joint Venture to sell substantially all of its assets and liabilities to Appaloosa Technology, Inc., an unsuccessful consulting and investment company that had been reduced essentially to a shell. The district court valued the Joint Venture's assets and liabilities as of the date of the Appaloosa sale and the court's valuation relied, to some extent, on the transaction documents.

Appaloosa acquired the Joint Venture's assets in exchange for 65,000,000 shares of Appaloosa stock, which amounted to approximately 85.5% of Appaloosa's total capitalization. Weston prepared proxy materials for the Appaloosa deal that included financial statements which Weston claimed "fairly present[ed] the financial condition" of the Joint Venture and were prepared "in conformity with generally accepted accounting principles." The financial statements indicated that the Joint Venture's "Total Assets" were $6,529,305 and that its partnership capital was $6,024,191. The proxy materials also indicated that the recent trading range of Appaloosa shares in the over-the-counter markets, taking into account an Appaloosa reverse stock split, was between $0.04 and $0.12 per share.

At the trial in April, 2000, Weston argued that the financial statements in

7

the proxy materials he had prepared in June 1985 did not reflect the real value of the Joint Venture as of that date. According to Weston, the balance sheet inflated the value of the Joint Venture because the assets were contingent on the Joint Venture's ability to collect debts from the Associates, which were subsequently invalidated by the court, and the balance sheet omitted significant liabilities, mostly litigation expenses, because these were not to be assumed by Appaloosa. The trading range also did not reflect any genuine value, because the volume of trading in Appaloosa shares was so thin that there was no real market for the shares. Weston then provided alternative accounting documents that he claimed represented the real value of the Joint Venture's assets and properly allocated its liabilities. The bottom line of the Weston documents was that Gold Technics' share of the true value of the assets was essentially canceled out by its share of responsibility for the Joint Venture's liabilities, with the result that the Gold Technics limited partners were not entitled to recover anything from the winding up of the Joint Venture.

The district court rejected Weston's alternative accounting, finding that "[t]here is no credible evidence that this court should reduce the amount in the Gold Technics' capital account by reason of Weston's after-the-fact accounting and reallocation of purported liabilities . . . ." Amended Findings at 8. The court ruled that the proper value of the Appaloosa stock delivered in exchange for the

8

Joint Venture's assets was $0.013 per share.        *Id*. at 10.

According to the district court's valuation, the appellees' share of the Joint Venture's assets was 5,593,600 shares, valued as of June 17, 1985, at $71,416.80. *Id.* at 11.  The court therefore found that Weston and Rex Montis were liable to Appellees for that amount, as adjusted for certain other transactions between the parties, including a previously-adjudicated liability of $18,620 due to Appellees from Weston and Rex Montis for conversion of Rex Montis shares that belonged to Gold Technics.   Amended Findings at 4, 11; *See Cascade I*, 896 F.2d at 1582-83; *Cascade II*, 1996 WL 15549 at **3.  The court ordered Weston and Rex Montis to pay that amount, in cash, directly to Appellees.

## DISCUSSION

After three district court trials and two prior appeals to this Court, the only issue remaining is whether the district court correctly valued and properly distributed the assets and liabilities of the Joint Venture.

## I.

The issues in this appeal can be categorized under three heads.  First, Appellants Weston and Rex Montis (hereinafter "Weston") argue that the district court overvalued the Joint Venture's assets and failed to take into account Gold Technics' share of responsibility for its liabilities.  Second, Weston claims that the district court erred when it dissolved the Gold Technics partnership and

9

distributed its share of the Joint Venture's assets directly to the individual limited partners. Third, Weston argues that the district court should have enforced certain indemnification provisions in the Joint Venture Agreement and the Gold Technics Partnership Agreement and required Gold Technics to indemnify Weston and Rex Montis for expenses they incurred on behalf of the Joint Venture.

## A.

Weston advances a number of arguments that purport to show that the district court's valuation of the appellees' share of the Joint Venture's assets and liabilities was clearly erroneous. In general, findings of fact are not clearly erroneous unless they are without factual support in the record or the appellate court, after reviewing the evidence, is firmly convinced that a mistake has been made. *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998).

Weston claims that the district court erroneously refused to adjust the appellees' accounts for their share of expenses that the Joint Venture continued to incur after the dissolution of the Joint Venture. These expenses turn out to be the money that Weston and his affiliated entities spent on the very lawsuits that generated this appeal. At first blush, it seems that Weston, with astonishing chutzpah, is attempting to bill the appellees for the money Weston spent suing them, even though *Cascade I* required Weston to pay the defendants' attorneys' fees because his original cause of action was without merit and brought in bad

10

faith. 896 F.2d at 1579. However, Weston points out that he also spent money defending himself and his affiliated entities against securities fraud and other counterclaims made by the Associates, some of whom were not Gold Technics limited partners, and that his successful defense against these claims effectively preserved assets that, in part, belonged to Gold Technics. Gold Technics should, he reasons, therefore be required to pay some share of these expenses.

The previous decisions of this case, however, have already established that Gold Technics is not responsible for post-1985 liabilities of the Joint Venture. The district court in 1985 issued a finding that relieved Gold Technics of any liability for the subsequent legal fees and other expenses of Weston and his related entities:

> There [was] a complete and irremedial [sic] breakdown in the relationship between Gold Technics, Ltd. on the one hand and Cascade, Rex Montis, Weston and his related entities on the other with respect to the joint venture. The purpose of that venture as far as the interest and participation of Gold Technics, Ltd. is concerned, has been frustrated, obstructed, and rendered impracticable and futile by the unlawful and improper conduct of the other members of the joint venture and of Weston, the joint venture thereby has been terminated de facto as far as Gold Technics, Ltd. is concerned and the *latter should be relieved from further participation and responsibility with respect to the joint venture*.

District Court Findings of Fact and Conclusions of Law on Accounting Dated September 16, 1985 ("Accounting Findings"), *Cascade Energy & Metals Corp. v. Banks*, No. C-82-1223C, (D. Utah September 16, 1985) at 22-23, (emphasis

11

added).  This finding was not subsequently overturned in *Cascade I* or *Cascade II.*  The district court's refusal to revisit this finding was not clearly erroneous (indeed we can perceive no lawful basis for doing so), and we accordingly affirm the district court's refusal to hold Gold Technics responsible for the subsequent legal fees and other expenses of Weston and his affiliated entities.

Even if Gold Technics is excused from post-1985 liabilities, Weston still maintains that the district court erroneously refused to consider certain pre-1985 liabilities that were not disclosed on the financial statements Weston prepared for the Appaloosa transaction.  The district court found that, according to the terms of the Appaloosa transaction, there were no outstanding liabilities of the Joint Venture that were not assumed by Appaloosa.  Amended Findings at 8.  The district court therefore ignored the alleged liabilities and proceeded directly to a valuation of the Joint Venture's assets and the Appaloosa shares.  Weston now contends that, despite the plain language of the transaction documents, Appaloosa only assumed *some* of the Joint Venture's liabilities.  The Appellees, naturally, strenuously disagree.

Even if we agree with the Appellees and the district court that Appaloosa assumed all of the Joint Venture's liabilities, this does not cause the liabilities to disappear magically.  Assumed liabilities would decrease the value of the Appaloosa shares that the Joint Venture received as consideration, and unassumed

12

liabilities would remain on the Joint Venture's balance sheet. Either way, if the liabilities are genuine, they must be taken into account in valuing the Joint Venture's assets and the shares received in exchange for those assets. Thus, the real inquiry is what the relevant assets and liabilities were and how much they were worth.

Because the case had already been tried and appealed twice, the district court could not perform its valuation from a blank slate. The value of the Joint Venture's principal assets, the mine lease and the "Ore Milling Receivable," had already been set in *Cascade II* at $1,339,034. 1996 WL 15549 at **1. The district court valued the 65,000,000 Appaloosa shares acquired in exchange for these assets at $0.013 per share, for a total value of $840,000. Unfortunately, the district court did not plainly set forth the method it employed to reach this valuation. However, since the district court was bound by *Cascade II*'s asset valuation, we can infer from the $499,034 difference between the *Cascade II* asset valuation and the district court's current valuation that the district court determined that there were almost half a million dollars' worth of offsetting liabilities.

It is not clear from the district court's findings why it applied the half-million dollar haircut. An examination of the numbers, however, reveals the probable basis for this conclusion. As noted above, the district court primarily

13

relied on the balance sheet Weston prepared for the Appaloosa proxy materials. The balance sheet lists liabilities of $495,114. We infer that the district court subtracted the balance sheet liabilities ($495,114) from the adjudicated value of the Joint Venture's principal assets ($1,339,034), yielding $843,920, and then rounded down to $840,000, which is equivalent to $0.013 per share of Appaloosa stock.

This valuation is actually generous to Weston. Almost half of the liabilities on the balance sheet are bank notes payable to Downey Bank and Zions Bank. Weston previously stipulated to the fact that these bank notes should not be considered as liabilities of the Joint Venture in the winding up. *See* District Court Order Denying Relief from Prior Contention Dated September 30, 1999. The district court therefore has arguably undervalued the Joint Venture's assets by approximately $225,000. Since Appellees have not filed a cross-appeal, there is no need for this Court to determine whether that constituted legal error.

Not content with this apparent boon, Weston contends that the district court should have considered numerous additional liabilities that were not disclosed in the Appaloosa proxy materials. The district court, as noted above, rejected Weston's after-the-fact accounting on credibility grounds, and we see no reason to overturn that determination. When a trial court's findings are based on credibility determinations, those findings are entitled to great deference. Fed. R.

14

Civ. P. 52(a); *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). The documents in question are particularly suspect, because they were prepared after the onset of litigation, and in some instances twenty years after the transactions they purported to record took place. In addition, two different district court judges in this case have made findings criticizing the "convoluted nature of [Weston's] control," Accounting Findings at 17, and commenting that Weston's "commingling" of funds and other dubious accounting practices raised "serious questions concerning credibility." *Id.* at 15-16; *see also* Amended Findings at 8. Weston also expressly represented in the Appaloosa transaction documents that the Joint Venture had no liabilities that were not disclosed on the balance sheet. The district court's decision not to credit Weston's convenient, post hoc accounting and to rely instead on Weston's contemporary representations in the proxy materials was not clearly erroneous.

Finally, Weston contends that the district court's valuation of the Appaloosa shares impermissibly relied on "pink sheet" price quotations as set forth in Weston's proxy materials. He points out that this Court has previously questioned the validity of pink sheets in establishing the value of over-the-counter stock. *See Schwartz v. Slawter*, 751 F.2d 317, 321 (10th Cir. 1984) (suggesting pink sheets can be used to establish value, but only where a limited number of shares would be available at one time); *Pandolfo v. United States*, 128 F.2d 917,

15

921 (10th Cir. 1942) (concluding pink sheet quotations were "too uncertain, shadowy, and speculative, to form any sound foundation for the determination of value" in a mail fraud prosecution). This contention is without merit, because it mischaracterizes the extent to which the district court relied on the pink sheet quotations. As noted above, the district court's valuation of the Appaloosa stock was based primarily on a valuation of the Joint Venture assets and liabilities that were exchanged for the stock. In addition, the district court expressly noted that it also took into account the fact that the shares were "restricted" under applicable securities laws and that there was no immediate public market for the shares. Amended Findings at 10-11. Thus, the district court's valuation was appropriately based on reliable indicators of value independent of the pink sheet quotations.

For these reasons, we see no reversible error in the district court's valuation. *Cascade I* recognized that the dizzying multitude of parties, issues, business entities, and inconsistent financial records in this case imposed on the district court an exceedingly difficult task, and the Court accordingly complimented the district court for its efforts. 896 F.2d at 1584 n.28. As the first district court pointed out, " The accounts and accounting involved here are so voluminous, convoluted and complex as likely to have required months of work by accounting experts and the expenditure of unacceptable sums of money to fully

16

evaluate and determine the accuracy of the accounting submitted herein, if this could ever be accomplished." Accounting Findings at 9. In such a case, it is appropriate to grant the district court considerable latitude in its effort to impose order on chaos, and the district court's valuation is well within the permissible range.

B.

Weston also challenges two of the district court's conclusions of law, in which the district court held that Appellees were entitled to a judicial dissolution not only of the Joint Venture but also of the Gold Technics partnership itself, and that Weston and Rex Montis, through their breaches of fiduciary duties, were responsible for the dissolution. Weston now argues that the district court should not have dissolved Gold Technics because neither party had raised the issue of dissolution at any stage of the two-decade litigation, and none of the previous decisions had ordered it. Weston points out that, under various state laws, partnerships are presumed to continue in existence and should not be dissolved without good cause. According to Weston, the district court's *sua sponte* dissolution of Gold Technics constitutes a due process violation because it was done without the issue having been raised previously, without notice to the parties, and without adequate briefing.

Weston's claim that none of the previous decisions ruled on the dissolution

of Gold Technics is false.  The first district court ordered that "Gold Technics, Ltd. is terminated and dissolved and shall have no separate right against any of the entities herein."  Order Amending Judgment and Finding of Fact Dated November 19, 1985, *Cascade Energy & Metals Corp. v. Banks*, No. C-82-1223C, (D. Utah November 19, 1985) at 3; *see also Cascade I*, 896 F.2d at 1567 (noting the district court's order to dissolve Gold Technics).  Neither *Cascade I* nor *Cascade II* overturned the dissolution of Gold Technics.  The legal conclusion regarding the dissolution of Gold Technics is therefore law of the case in this appeal.  Under the law of the case doctrine, "[a] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950, 992 (10th Cir. 2003) (quotation omitted).  The establishment in *Cascade I* of the law of the case not only binds the trial court on remand but also must be followed by the appellate court in subsequent appeals. *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1183 (10th Cir. 1995).  We therefore must uphold the dissolution of Gold Technics unless one of three narrow exceptions to the law of the case doctrine applies: (1) the evidence in the subsequent trial is substantially different; (2) controlling authority has subsequently made a contrary

18

rule of law applicable; or (3) the decision was clearly erroneous or would work a manifest injustice. *Concrete Works*, 321 F.3d at 993.

None of the exceptions applies here. Weston has pointed to no new evidence or new law that would require or even suggest that the earlier dissolution of Gold Technics was erroneous. Moreover, the decision itself was not clearly erroneous, because there is ample support in the record for the dissolution. The misappropriation by Weston and his entities of roughly half a million dollars' worth of the Joint Venture's assets was simultaneously a misappropriation of Gold Technics' assets, since Gold Technics was one of the parties to the Joint Venture. In addition, Weston and Rex Montis were found liable to the Gold Technics limited partners for conversion of $18,620 worth of Rex Montis shares that belonged to Gold Technics. *Cascade II*, 1996 WL 15549 at **3. These egregious breaches of the fiduciary duties Weston and Rex Montis owed to the Gold Technics limited partners clearly justify the dissolution.

Finally, we do not see how dissolving Gold Technics would work a manifest injustice. Indeed, Weston provides no explanation of why Gold Technics should continue in existence. Gold Technics' original purpose, investment in the Telegraph Mine, has been frustrated by Weston's misappropriations, and the partnership does not seem to have conducted any business activity since 1985. Thus, the only effect of *not* dissolving Gold

19

Technics would be that Weston, through his control of Rex Montis, Gold Technics' general partner, would maintain control of Appellees' share of the Joint Venture's assets. Preserving the Gold Technics partnership would likely result in nothing other than additional shell games and further litigation before the limited partners could finally extract their money from the Weston vortex.

For these reasons, the conclusion that Gold Technics be dissolved and its assets distributed among its partners is law of the case, and we must follow it. The district court's conclusions to that effect are accordingly affirmed.

C.

Weston argues that the district court improperly refused to enforce provisions of the Joint Venture Agreement that require Gold Technics to indemnify Weston and Rex Montis for losses they incurred on behalf of the Joint Venture. Because the "losses" for which Weston claims indemnity are the loans from Zions Bank and Downey Bank discussed in Part A above, this argument is simply an attempt to smuggle the bank liabilities back into the case. As noted above, the district court in 1999 refused to allow Weston to reverse his prior concession that the bank loans were unavailable as offsets. In addition, the first district court found that the loans in question were disbursed to Cascade, for its own purposes, and that liability for the notes never appeared on any Joint Venture documents until after litigation commenced. Accounting Findings at 19. The

20

same reasons for refusing to allow the bank loans as offsets apply to the refusal to allow the bank loans as obligations requiring indemnification.  Therefore, the district court's refusal to allow Weston to revisit this issue was not erroneous.

## II.

Tenth Circuit Rule of Appellate Procedure 46.5(B)(2) states that an attorney, by signing and submitting a brief to the Court, certifies that "the issues presented are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law." Regrettably, the briefs signed and submitted by Delano S. Findlay, attorney for Appellant Rex Montis, fail to meet this standard.

The Appellants' briefs, which are the joint product of Findlay and Weston, pro se, advance several arguments that have already been decided in the prior appeals or were not raised in the prior appeals.   As noted in Part B above, the law of the case doctrine forecloses reconsideration of these issues.  Appellants did not argue any exception to law of the case, nor did they present any other good faith reasons for seeking to overturn previous judgments.  Instead, Appellants in some instances falsely asserted that the issue remained open, and in others they failed to mention that the issue had already been decided and simply argued the issue anew, as if the previous trials and appeals had never taken place.

The following list enumerates only the most obvious examples of

21

Appellants' advancement of arguments that have already been adjudicated.

1. Appellants' brief states repeatedly that the issue of dissolution of Gold Technics "has never been raised previously," Appellants' Br. iii, that "the Gold Technics Limited Partnership has never been dissolved," *id.* at 39, that the "Circuit Court did not provide for or require a dissolution or winding up of Gold Technics," *id.*, and that Appellants have "never been given any notice of any kind to dissolve the limited partnership." *Id.* None of this true, as the first district court filed an amended order specifically mandating the dissolution of Gold Technics. Order Amending Judgment and Finding of Fact Dated November 19, 1985 at 3. This holding was specifically noted by this Court on appeal, *Cascade I*, 896 F.2d at 1567, and was not overturned, *id.* at 1583-84.

2. Appellants' brief argues that the Gold Technics limited partners are required to indemnify Weston and his affiliated entities for the Zions Bank and Downey Bank loans. Appellants' Br. 43-45. However, the appellants conveniently neglect to mention that they had previously conceded that these liabilities were unavailable as offsets and that the district court had, after extensive briefing, denied their motion for relief from this prior contention. *See* District Court Order Denying Relief from Prior Contention Dated September 30, 1999. In addition, the appellants failed to inform us that the first district court had issued a relevant finding of fact, in which the court stated that the loans were

obtained by Cascade for its own purposes and that liability for the notes did not appear on Joint Venture documents until after the onset of litigation. Accounting Findings at 19.

3. Appellants contend that Gold Technics is only entitled to a distribution of 5% of the Joint Venture's assets, regardless of its 10% ownership interest, because it had only contributed $75,000 of its original $150,000 obligation. Appellants' Br. 28. Yet again, Appellants fail to mention that a relevant finding of an earlier district court relieves Gold Technics from any payment or accountability for the $75,000 balance and that this finding was expressly upheld by this Court in *Cascade II.* 1996 WL 15549 at **3.

4. Appellants assert that the Joint Venture's assets were worth $325,000 as of June 17, 1985. Appellants' Br. 18. But the value of these assets was already set in *Cascade II* at approximately $1,339,000, a fact which somehow failed to make an appearance in Appellants' briefs. Later, they claim that the district court's finding of a $1,339,000 value was erroneous, Appellants' Br. 30 (challenging Conclusion of Law No. 2), and urge us to overturn it, even though that finding is compelled by our ruling in *Cascade II*.

These are serious misrepresentations, but it gets worse. In their reply brief, Appellants attempt to re-litigate the issues of whether Weston and his affiliated entities breached fiduciary duties to the limited partners and whether there was a

23

"wrongful termination" and "wrongful mismanagement" of the Joint Venture by Weston and his affiliated entities. Appellants' Reply Br. 12-13. These issues were already decided by the first district court, Accounting Findings at 19, and upheld in *Cascade I*, 896 F.2d at 1570-74. Appellants, however, not only fail to explain how they can reargue these issues in the face of *Cascade I*, but they also claim that these issues were expressly left open by *Cascade II*. In support of this surprising proposition, Appellants' brief contains the following text, indented and single-spaced in block quote form, that purports to be an exact quotation of footnote 28 in *Cascade II*:

> the case was a complicated case and that it did not foreclose the district court from filling in gaps and doing other things consistent with its opinion to achieve a just resolution of the case. **The Limited Partners have not countered the arguments made by appellant in their opening briefs on these points.** Their only defense on these matters is to argue they were not properly part of the issues to be tried on remand. This Court should consider and determine **these issues based upon the weight of the evidence.**" (Emphasis added)

Appellants' Reply Br. 13.

As it turns out, there is no footnote 28 in *Cascade II*. *Cascade I*, however, has a note 28, which reads as follows:

> We note that this is a complicated case and things may have changed since trial. We do not foreclose the district court from filling in gaps and doing other things consistent with this opinion in order to achieve a just resolution of the case. We also want to compliment the district court for its careful analysis and review of the very complex facts underlying the many disputes between the parties.

24

896 F.2d at 1584 n.28.

Comparing Appellants' quotation with the original, we see that the first sentence of Appellants' purported quotation from *Cascade II* is actually a paraphrase of the first two sentences of a footnote in *Cascade I*. The rest of Appellants' quotation, which is the part that supports their position, is not to be found in the footnote at all. Although part of the rest of the quotation is similar to language found in *Cascade II*,[2] the substance of the quotation does not appear in *Cascade II*, and *Cascade II* does not support Appellants' assertion.

The quotation is therefore not a quotation at all. It is, instead, Appellants' unfounded arguments in Appellants' own words, masquerading as an exact quotation from a decision of this Court.

This is not the first time that Mr. Findlay has re-litigated issues already decided, or misrepresented the law in an attempt to mislead the court. In *Cascade II*, we upheld the district court's imposition of a $250 sanction on Mr. Findlay for

---

[2]In its remand to the district court for a winding up of the Joint Venture, the Court noted that "the appellees have failed to address the issues concerning the district court's winding up of the Joint Venture in their brief." *Cascade II*, 1996 WL 15549 at **6. The "issues" that the appellees failed to address are limited to the winding up of the Joint Venture and clearly do not include whether Weston and his entities breached fiduciary duties or caused the termination of the Joint Venture. As noted above, these issues had already been decided in *Cascade I*. By juxtaposing language similar to the above quotation from *Cascade II* with the beginning of footnote 28 from *Cascade I*, which refers to the case in general, Appellants' "quotation" gives the impression that the "issues" left open by *Cascade II* are much broader than they really are.

25

attempting to have the district court reconsider an issue already decided in *Cascade I.* 1996 WL 15549 at **5. We also upheld sanctions against Mr. Findlay for deceptively misquoting a California statute in a bankruptcy proceeding involving many of the same facts and parties as this case. *Cascade Energy & Metals Corp. v. Banks*, 87 F.3d 1146, 1151-52 (10th Cir. 1996). It seems, then, that Mr. Findlay has been fairly warned that conduct of this sort violates Tenth Circuit rules and warrants imposition of sanctions.

We therefore order Appellants' counsel, Mr. Findlay, to show cause why monetary sanctions should not be imposed on him personally. Mr. Findlay shall have ten days from the date of this opinion to file his objections. The appellees also may, but are not required to, file a brief. Briefs shall not exceed ten pages. If the objections are not filed within ten days, monetary sanctions shall be imposed. If Mr. Findlay timely files objections, we will not impose sanctions until we have ruled on the objections.

For the foregoing reasons, we AFFIRM the district court's decision in its entirety.